C. David SWIFT, Administrator of the Estate of Berl B. Cantrell, Deceased, Appellant,

v.

SOUTHERN RAILWAY COMPANY, Appellee.

No. 8516.

United States Court of Appeals Fourth Circuit.

Argued March 23, 1962.

Decided Aug. 1, 1962.

**316**

John M. Schofield, Rock Hill, S. C. (Arch Schoch, High Point, N. C., on brief), for appellant.

Robert A. Collier, Jr., and R. A. Collier, Statesville, N. C. (William T. Joyner, Joyner & Howison, Raleigh, N. C., and Collier, Harris & Collier, Statesville, N. C., on brief), for appellee.

Before HAYNSWORTH, BOREMAN and J. SPENCER BELL, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The principal question is whether the doctrine of last clear chance furnishes a permissive basis of recovery in this action for wrongful death of a decedent killed by one of the defendant's trains. We agree with the District Court that it does not.

As the train approached, Berl Cantrell was prone on the roadbed, down between the rails, his jacket pulled up over his head. He may have intended his destruction, but his position was one of apparent helplessness. The essential inquiry, therefore, is whether the evidence warranted a finding that the train crew should have seen and recognized him as a human being in time to stop the train before running over him.

Southern Railway Company, the defendant, operates, among others, a line running between Salisbury and Asheville, North Carolina. This line passes through the town of Valdese, North Carolina. Leaving Valdese, proceeding westwardly toward Asheville, this single track line enters a deep cut spanned by a bridge

known as the Hoyle Street Bridge. Cantrell was lying between the rails at a point a few feet east of that bridge.

Shortly before 3:00 o'clock in the afternoon of January 4, 1960, a local westbound freight train approached the Hoyle Street Bridge. It slowed as it passed through the central portion of Valdese, but increased its speed to thirty-five to forty miles per hour as it approached and negotiated a curve to the left within sight of the Hoyle Street Bridge. There was testimony that the rails beneath the bridge could be seen from a point 1050 feet east of the bridge, measured along the curve of the track. The view from that point would be across the curve and an object down between the rails close to the bridge would be partially or wholly obscured by the near rail. The west end of the curve to the left was some 500 to 600 feet from the Hoyle Street Bridge, and only when the train reached that point would the view of the roadbed between the rails close to the bridge cease to be obstructed by the near rail.

While there was testimony that one could look across the curve and see the rails beneath the bridge from a distance of 1050 feet, measured along the track, there was no testimony and no indication that, from that distance, one could see, and recognize as such, the body of a man down between the rails close to the bridge. The engineer and fireman of the train testified that, as they came out of the curve, they saw an object down between the rails close to the bridge. One thought at first it was a piece of brown paper, the other a piece of asbestos, objects which they expected to see in that vicinity. When the train was within 200 to 250 feet of the object, they recognized, at about the same time, that the object looked like a human being. There was an exclamation from one of the crewmen and, at the same time, the engineer applied the brakes with sand on the rails. Nevertheless, with the brakes and associated equipment in full emergency operation, the train ran over Cantrell and proceeded on for a further distance of approximately 1000 feet, or 25 car lengths. The Chief of the Valdese Police Force testified that he observed the sand, evidence of emergency braking, and that he paced off the distance between the point where Cantrell was struck by the train to the point where it was finally brought to a halt and found it to be 1000 feet.

As the train approached the bridge, it was proceeding on a downgrade. A surveyor, a witness for the plaintiff, testified that in the 600 feet, east of the bridge, the grade was falling in the direction the train was going at a rate of .7 to 1-foot in each 100 feet.

At the time, Berl Cantrell was only 22 years old. Three years earlier he had been severely injured in an automobile accident. After the accident he received a medical discharge from the Air Force with a diagnosis of traumatic encephalopathy. He experienced blackouts and was required to return from time to time to Walter Reed Hospital for treatment. On the morning of the day he was killed, he complained of a very severe headache, with which he had suffered during the preceding night. Some seven months earlier he had married, but his wife had gone to her home in Georgia for a visit just after Christmas in 1959, and Cantrell was staying with his mother at the time of his death. He left his mother's home after lunch on that day, stating that he intended to go to Crest Line Furniture Company, by whom he had been employed for a time, for the purpose of getting some papers in connection with a loan and some insurance.

Crest Line's plant is south of the railroad at a point several hundred feet east of the Hoyle Street Bridge. Some of its employees crossed to and from the north side of the railroad, and there were defined footpaths crossing the railroad near the plant. There was no evidence of any such path or traffic in the cut near the bridge, however, and no evidence that Cantrell, normally or possibly, would have walked the train track through the cut in going from his mother's home to the Crest Line plant.

Nevertheless, it is undeniable that he was on the track between the rails in the cut near the bridge. How he got there is unexplained, though there is speculation that he jumped or fell from the bridge, that he lay down between the rails and pulled his jacket over his head with the intention of destroying himself, and, finally, that, for some reason, he was walking the track through the cut, blacked out and fell, unconscious, between the rails in the position in which he was later run over.

■ Long ago the North Carolina Supreme Court adopted that humanitarian variant of proximate causation, which has come to be known as the doctrine of last clear chance.[1] Under that doctrine, the antecedent negligence of one killed or injured is not treated as a proximate cause of the injury if the other party had an opportunity to avoid the injury and failed to exercise due care to do so. Applied by the North Carolina Supreme Court, whose decisions govern us in this diversity case, it becomes applicable only upon proof, (1) that the decedent was killed by the defendant's train, (2) that before he was struck, the decedent was down on the track in a condition of apparent helplessness, (3) that the engineer saw, or should have seen, the decedent and recognized him to be a human being in time to stop the train before striking him, and (4) the engineer thereafter failed to exercise ordinary care to bring the train to a stop.[2]

■ There is no doubt, however, that North Carolina strictly enforces the prerequisite conditions before it permits recovery upon the basis of the doctrine of last clear chance in cases comparable to this one. The defendant asserts that the North Carolina Supreme Court has sanctioned submission of the issue to the jury in comparable cases only twice since 1935.[3] Our research has disclosed other instances,[4] but it appears that submission of the issue is not sanctioned in that state, unless there is clear proof of the decedent's apparent obliviousness of danger[5] and of an actual opportunity by the crewmen of the train to avoid striking him.[6]

■ In North Carolina, an engineer is under no duty to apply his brakes or to make any move to stop his train when he sees an object upon the track. The duty arises only when he sees and recognizes the object as a human being, or, when, in the exercise of due care, he should have seen and recognized the object as a human being and realized that the person was in a state of danger and

1. Gunter v. Wicker, 85 N.C. 310 (1881).

2. Lee v. Atlantic Coast Line R. Co., 237 N. C. 357, 75 S.E.2d 143, 147.

3. Wade v. Jones Sausage Co., 239 N.C. 524, 80 S.E.2d 150; George v. Winston-Salem Southbound Ry. Co., 217 N.C. 684, 9 S.E. 2d 373.

4. Trull v. Austin, 252 N.C. 367, 113 S.E. 2d 552 (1960); Daughtry v. Cline, 224 N.C. 381, 30 S.E.2d 322, 154 A.L.R. 789 (1944); Jones v. Southern Ry. Co., 217 N.C. 170, 7 S.E.2d 472, 473 (1940); Hunter v. Bruton, 216 N.C. 540, 5 S.E.2d 719 (1939); Newbern v. Leary, 215 N.C. 134, 1 S.E.2d 384 (1939). And see Ammons v. Britt, 256 N.C. 248, 123 S.E.2d 579 (1961); Cassetta v. Compton, 256 N. C. 71, 123 S.E.2d 222 (1961).

5. Irby v. Southern Ry. Co., 246 N.C. 384, 98 S.E.2d 349, 70 A.L.R.2d 1 (1957); Boone v. North Carolina R. Co., 240 N.C. 152, 81 S.E.2d 380 (1954); Lee v. Atlantic Coast Line R. Co., 237 N.C. 357, 75 S.E.2d 143 (1953); Osborne v. Norfolk & W. Ry. Co., 233 N.C. 215, 63 S.E. 2d 147 (1951); Ingram v. Smoky Mountain Stages, 225 N.C. 444, 35 S.E.2d 337 (1945); Battle v. Southern Ry. Co., 223 N.C. 395, 26 S.E.2d 859 (1943); Long v. Norfolk & Western Ry. Co., 222 N.C. 523, 23 S.E.2d 849 (1943); Russ v. Atlantic Coast Line R. Co., 220 N.C. 715, 18 S.E. 2d 130 (1942); Justice v. Southern Ry. Co., 219 N.C. 273, 13 S.E.2d 553 (1941).

6. Gunter v. Winders, 256 N.C. 263, 123 S.E.2d 475 (1962); Grant v. Royal, 250 N.C. 366, 108 S.E.2d 627 (1959); Barnes v. Horney, 247 N.C. 495, 101 S.E.2d 315 (1958); Osborne v. Norfolk & Western Ry. Co., 233 N.C. 215, 63 S.E.2d 147 (1951); Aydlett v. Keim, 232 N.C. 367, 61 S.E.2d 109 (1950); Long v. Norfolk & Western Ry. Co., 222 N.C. 523, 23 S. E.2d 849 (1943).

of helplessness.[7] As the court said in Long v. Norfolk & Western Ry. Co., 222 N.C. 523, 23 S.E.2d 849:

"It is not the duty of an engineer to stop his train every time he sees some object on the track. The plaintiff must show that the engineer saw, or by the exercise of ordinary care could have seen, an object having the appearance of a human being lying on or dangerously near the track, and that he saw it, or by the exercise of ordinary care could have seen it, in time to stop his train before striking the body."

█ In applying these principles here, it is apparent there was a failure of proof of the requirement for application of the doctrine, strictly observed in North Carolina, that the crewmen of the train had a real opportunity to avoid injury to Cantrell. The testimony shows that the brakes were applied at least 200 feet before the train reached Cantrell and that, thereafter, there was nothing the train crew could do that was not done by them. Nevertheless, the train traveled approximately 1200 feet, or more, from the time of application of the brakes until the train came to a halt.

As we have noted, there was testimony that one looking across the curve could see the rails beneath the Hoyle Street Bridge, or at least the near rail, from a distance of 1050 feet, measured along the track, but there was no testimony by anyone that a person down between the rails near the bridge could be seen and recognized as a human being from any such distance. The engineer and fireman testified that they first saw Cantrell as they came out of the curve some 500 to 600 feet away from him. If the testimony might be susceptible to an inference that, in exercise of due care, they immediately should have recognized that the object was a man and not a piece of paper or asbestos, there is no showing whatever that the train, at that speed and on that downgrade, could have been stopped within that distance. The evidence of the actual distance it took the train to stop demonstrates that the train could not have been stopped in 500 to 600 feet, had the brakes been applied immediately as the train came out of the curve. Indeed, there is no showing here that had the trainmen, looking across the curve at the near rail, seen Cantrell when the bridge first came within their view, some 1050 feet away, when they were traveling at a rate of approximately 51 feet per second, they could then have reacted, applied the brakes and stopped the train before striking him. More importantly, however, there is absolutely no proof that, at that distance and under those circumstances, they could or should have recognized that the object was a human body.

On this record, therefore, we think it clear that the North Carolina requirements for application of the doctrine of last clear chance have not been met. There is no showing that the train crewmen had any real opportunity to avoid striking Cantrell after they saw him, or after they should have seen and recognized him to be a human being. We think that the District Court properly refused to submit the issue to the jury.

The plaintiff has a number of other subordinate contentions.

█ He complains that defense counsel was permitted in argument to the jury to suggest that Cantrell was attempting suicide. We think the argument was permissible. As a result of the automobile accident three years earlier, Cantrell was enduring great physical disability. He suffered from severe headaches, blackouts and memory difficulties. There was a suggestion of marital trouble and he was physically unable to hold a job. The fact that his coat was pulled over his head as he lay between the rails is perhaps some indication that he placed himself in that position and did not merely fall.

7. Long v. Norfolk & Western Ry. Co., 222 N.C. 523, 23 S.E.2d 849; Morrow v. Southern Ry. Co., 213 N.C. 127, 195, S.E. 383.

■ All of these circumstances seem to us sufficient to support an exercise of the District Court's discretion in permitting defense counsel to suggest to the jury the possibilities of a suicidal purpose. In light of that argument, doubtless the Court would have instructed the jury on the legal presumption against suicide, if requested to do so. No such request was made, however, and the plaintiff is not in a position to complain of prejudice on account of the omission of the unrequested instruction.

The plaintiff offered as an expert witness a fireman employed by another railroad. The witness was not an engineer and his experience as a fireman had been principally obtained from hostling in repair shops. He was offered for the purpose of obtaining expert opinion as to the distance within which the defendant's train could have been stopped at the time and place of the accident. The District Court ruled he was not qualified as an expert and refused to permit him to express an opinion.

■ The qualification of an expert witness is committed to the discretion of the trial judge.[8] He is not required to accept as an expert every witness who professes to be one. He is not required to accept as an expert opinion the speculation of every lay witness who is willing to venture it.

■ Here, we think that the District Court properly refused to accept the witness as an expert and to permit him to express an expert opinion. Certainly, its refusal to do so was not an abuse of the discretion lodged in it.

The witness had some experience as a fireman on trains. His experience had been largely confined to operations within a railroad yard. He had looked at the defendant's track in the vicinity of the accident, but had no experience in operating trains over it and claimed no expertise in computing the stopping distances of trains of varying composition under varying conditions, or even any information of the grade of the defendant's track at the point in question, or of the distances involved. Indeed, while he was on the witness stand, he estimated the distance eastwardly from the Hoyle Street Bridge along the straight track to the beginning of the curve as being the length of two football fields. It became apparent, however, that he thought a football field was 300 yards, not 100 yards, long. The District Judge was clearly justified in ruling that this witness should not be allowed to express an opinion in terms of the length of football fields, as to the distance in which the defendant's train in this instance might have been stopped.

■ The plaintiff complains that he was not given an opportunity, out of the hearing of the jury, to object to the Court's instructions. A party is entitled to such an opportunity under Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A. The Rule does not provide that such an opportunity will be afforded without a request of counsel, but certainly that is the desirable practice. Counsel, for a number of reasons, may be reluctant to make a request, in the presence of the jury, that the jury be excused for discussion of an objection to the court's charge. The court should take the initiative. It can excuse the jury and thus afford counsel the opportunity contemplated by the Rule. If, in a routine case, that be thought a needless inconvenience of the jury, the court can summon counsel to the bench or to the judge's chambers and privately inquire if there are objections. If such a private inquiry is made at the bench and counsel indicates his wish to record an objection, the jury should be immediately excused,[9] so that the objection may be properly made and considered on the record.

■ Failure of the court to take the initiative in setting the stage for receipt

8. Hunt v. Bradshaw, 4 Cir., 251 F.2d 103.

9. When a jury is excused to afford an opportunity for consideration of objections to the charge, it should be admonished by the Court not to commence its deliberations until further advised by the Court.

of objections to the charge, however, is not reversible error in the absence of prejudice.[10] If the charge as given is unobjectionable, neglect to affirmatively afford a proper opportunity to object is clearly harmless. Disregard of the Rule or of the preferred procedure for its observance may occasion criticism of the court. It may foreclose later enforcement of that portion of the rule which prohibits assignments of error, directed to the charge, unless the required objection has been sufficiently made. It does not require reversal, if the charge as given is substantively unobjectionable and if there are no other aggravating circumstances indicating actual prejudice.

 No prejudice is shown or suggested here. The plaintiff's only complaint of substance regarding the charge was the failure of the Court to submit the issue of last clear chance, but that issue had been tendered by written requests, which the Court had refused. It had ruled upon that matter, and failure to submit the issue was not an appropriate subject of further objection after the charge had been concluded. The only other objection, as such, to the charge, suggested by the plaintiff, was the Court's instruction that Cantrell was a trespasser. That objection is without foundation. On the evidence, it seems plain that Cantrell was a trespasser, but the point is academic, for the jury actually found that the railroad was guilty of negligence,[11] and its duty to exercise care to avoid injury to helpless people lying upon the track is not influenced by the status of the helpless person as a trespasser or as a licensee.[12]

Finally, it is contended that the trial judge displayed such bias and prejudice toward counsel for the plaintiff as to deprive the plaintiff of a fair trial.

 The record, which we have carefully read, does not sustain the charge.

Throughout the trial the District Judge was attempting to keep the proceedings moving expeditiously. He excluded a proffered exhibit which he regarded, with reason, as objectionable and of no assistance in developing the proof. In doing these things, he prodded counsel, but that is far from a display of bias which would prejudice the case in the eyes of the jury.

A trial judge must have a large discretion in the control of trial proceedings. That control should be exercised judiciously and without partiality, but experienced and productive trial judges maintain their control with firmness. They should do so. Contending counsel, in the absence of a judge, could not control trial proceedings or maintain their judicial character. Counsel can perform their offices effectively within the restraints imposed by a fair, but firm, trial judge.

Here the trial judge kept a firm hand upon the trial. The extent of his active participation may be thought somewhat greater than the bounds of necessity. It was not so excessive as to deprive the trial of its essential element of fairness. It was not so discriminate as to give an impression of partiality.

The issues were fully developed at the trial. Our review discloses a fair and proper submission of the case to the jury.

Affirmed.

10. Nolan v. Bailey, 7 Cir., 254 F.2d 638; Downie v. Powers, 10 Cir., 193 F.2d 760; Apple v. Schweke, 7 Cir., 172 F.2d 633; Illinois Central R. Co. v. Kelly, D.C.W. D.La., 81 F.Supp. 206.

11. It also found that Cantrell was guilty of contributory negligence.

12. The Court's instructions as to the railroad's duty of care were full and complete. They would have been equally appropriate if Cantrell had been a licensee who became unconscious while walking across the track at an established crossing. Harrison v. Atlantic Coast Line R. Co., 168 N. C. 382, 84 S.E. 519; Lay v. Richmond & D. R. Co., 106 N.C. 404, 11 S.E. 412.