**Hetty FEY, Plaintiff-Appellee,**

v.

**WALSTON & CO., INC., and Robert A. Spira, Defendants-Appellants.**

**Nos. 72–1487—72–1490.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1973.

Decided March 14, 1974.

John J. Enright, Edwin H. Conger, Chicago, Ill., for defendants-appellants.

Charles A. Boyle, George E. Faber, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CHRISTENSEN,* Senior District Judge.

CHRISTENSEN, Senior District Judge.

These are consolidated appeals in a suit for damages brought by a former customer (plaintiff-appellee Hetty Fey) against a stockbroker (defendant-appellant Walston & Co., Inc.) and its salesman (defendant-appellant Robert A. Spira) for alleged "churning"[1] of the customer's account. Jurisdiction was alleged and existed by virtue of Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.[2]

The case was submitted by the trial court to the jury on the issue of whether the conduct of the defendants constituted account "churning", and thus a device, scheme or artifice to defraud within the meaning of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, and in view of the Rules of Fair Practice of the National Association of Securities Dealers, Article III, Sec. 15(a).[3]

Trial was held in the district court before a jury of six members pursuant to local rule, despite defendants' motion to

---

* Senior District Judge of the District of Utah sitting by designation.

1. In general "churning" signifies in the securities business the practice by a broker of advancing his own interest (his commissions based on trading volume) without regard to his customer's objectives by a course of trading which is excessive in light of the size and character of the customer's account.

2. The code citation inadvertently appeared in the complaint as 78j.

3. Proscribing "[t]ransactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account."

empanel a twelve member jury. A verdict was returned in favor of the plaintiff and against both defendants for $15,560 and judgment entered on the verdict. Motions for a directed verdict and for judgment notwithstanding the verdict were denied, as were motions for a new trial and Spira's motion for remittitur. A separate judgment in favor of the plaintiff for costs in the sum of $18,227.04, including $15,660 for attorneys' fees, was entered by the trial court. Both the judgment on the verdict and the supplemental judgment were appealed by both defendants. Appellants contend here that prejudicial error was committed by the trial court in numerous instances, which to the extent deemed to justify discussion may be categorized as follows:[4]

I. The claimed insufficiency of the evidence to warrant the verdict.

II. The preclusion or limitation of evidence both concerning plaintiff's objectives for maintaining her account with the defendant broker, and relating to her control, or that of her son under power of attorney from her, over the trading in question.

III. Claimed failure to instruct the jury correctly or adequately concerning appellee's theory of the case.

IV. Claimed errors in instructions concerning the measure of damages, and in denial of Spira's motion for damage remittitur.

V. The award of various elements of cost, including attorneys' fees.

Paragraph 5 of the complaint as originally filed alleged that prior to November, 1963, plaintiff Hetty Fey had little or no investment experience; that in that month, when she first became a client of the defendants, Robert A. Spira was so advised; that he was advised also that she would rely heavily on his advice and that as a widow her investment requirements were "maximum security and long term growth".

Elsewhere in the complaint it was alleged in substance that the defendants represented themselves as trustworthy for handling of plaintiff's securities; that in reliance upon these representations plaintiff on or about November, 1963, opened a cash account with the defendant broker which on or about December, 1963, on the advice and recommendations of the defendants was expanded to include a margin account, for the purpose of buying and selling securities as plaintiff Hetty Fey would from time to time instruct; that thereby a fiduciary relationship arose between plaintiff and the defendants; that plaintiff reposed complete trust and confidence in defendants and relied upon their advice, counseling and expertise but that her account with Walston & Co. was "not a discretionary account".

The complaint charged that in violation of their legal duties defendants purchased and sold securities on plaintiff's behalf without her authority and without her knowledge, failed to follow her instructions of purchase or sale, furnished false and misleading information, recommended purchases without disclosing the facts of such recommendations, recommended further purchases that were unsound in view of the financial condition of the companies and plaintiff's personal financial condition, without plaintiff's knowledge or authority effected repeated purchases and sales of securities on her behalf "and otherwise churned the plaintiff's . . . account".

The defendant broker, according to the complaint, failed properly to super-

---

4. We have not included appellants' original contention that Local District Court Rule 23 permitting six member juries was invalid and hence that the district court erred in refusing to empanel a twelve member jury. Appellants conceded during oral argument that the intervening decision of the Supreme Court in Colgrove v. Battin, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), in effect resolved this issue against her contention, it having been held that a twelve member jury is not required by the Seventh Amendment to the Constitution of the United States, nor by 28 U.S.C. § 2072, or Rule 48, Fed.R.Civ.P.

vise Spira's conduct "as agent and registered representative for its Chicago, Illinois office . . . failed to provide adequate internal controls [for] its Chicago, Illinois office, failed to review the activities of the Chicago, Illinois office and failed . . . " to examine the account of plaintiff to detect and prevent the violations.[5]

The acts, practices, statements, representations and course of conduct employed by the defendants, the complaint continued, constituted a device, scheme and artifice to defraud the plaintiff through utilization of the instrumentalities of interstate commerce and particularly of the mails and the facilities of the national security exchanges, and were carried on wilfully, maliciously, knowingly and with intent to defraud and deceive the plaintiff to her actual damages in the sum of $50,000. Punitive damages in the amount of $750,000 also were demanded, together with "costs".

Defendants denied the incriminatory assertions of the complaint and specifically denied that plaintiff had no investment experience. It was admitted that plaintiff's account was not a "discretionary account", denied that plaintiff advised Spira that she would rely heavily on his advice, and affirmatively alleged that plaintiff had stated that she was quite proud of her son's knowledge and ability and wanted him to trade for her and that some of the trades in question also were on the advice of other brokers and their salesmen.

Prior to the trial plaintiff filed a motion *in limine* seeking to bar inquiry into her prior stock dealings through other brokers by reference to her federal income tax returns. The trial court indicated that it would be "reversible error" for him to grant the motion in view of the allegations of paragraph 5 of the complaint, already summarized, and suggested that the only means by which such inquiry could be rendered irrelevant would be to strike that paragraph. Plaintiff readily embraced this suggestion and her motion accordingly was granted by the court. Apparently it was then the court's view that the striking of paragraph 5 rendered the controlling issue simply one of authority or lack of authority on the part of the defendants to make the trades in question and that any previous trading experience would not be material to this issue, despite the contrary analysis of the gist of plaintiff's claim by Spira's counsel prior to the court's ruling.[6]

The plaintiff, who was a widow, testified that she had been employed since her husband's death in 1956, having been left little or no assets. In November, 1963, she had $11,000 or $12,000 which she had accumulated in part "through some investments". When her counsel sought to establish what part her earned income played in this accumulation the trial court sustained an objection, saying, "the issue here is whether or not she authorized these people to make sales." When plaintiff later pressed a similar line of inquiry and argued that it went to the point of what would be considered "excessively trading her account" the court commented:

"Then you open it up for them to come in and show her experience in

---

5. Certain additional allegations concerning personal gain by defendant Spira beyond commissions need not be referred to further in view of the absence of any supporting proof.

6. Mr. Enright: ". . . As it became very amply clear during the just-now-concluded conference, it appears that this is what we call a churning case; and the claim of the plaintiffs (sic) is not so much that this individual stock was sold or that stock, but that the volume of trading was induced by the broker and the brokerage house to produce commissions and income. The matter at issue is: Was the customer induced to trade in a volume beyond her means to generate commissions; or was this the product of her own and the person she selected to manage the account during the period of time—a person not connected with Walston Company—was it their idea. Did they want to trade, did their wishes and desires produce this volume."

the field of investing. Is that what you propose?

"Mr. Boyle (counsel for plaintiff): No, your Honor.

"The Court: That is exactly what you will do if you get into that. I will then be compelled to let them show that she had some erudition and background. . . ."

Plaintiff testified that her son introduced her to Spira, the salesman. She opened an account with him after he telephoned her and told her of two stocks he wished to interest her in. It was her intention that she alone was to trade in the account. Initially she testified that the salesman started buying and selling securities for her without her knowledge and authority. Later she said that the account was a "discretionary" one and that she never objected to any of the purchases. Finally she testified that although it was not completely discretionary, the salesman had some discretion and that her practice was to telephone him after she received the confirmation if she had any question about the transaction. She testified that she relied upon the advice of Spira in reaching her decisions with specified exceptions and that she reposed in him great trust and confidence.

During cross-examination plaintiff stated that although she regularly received statements and confirmations, she had not objected to the trades in her account with the exception of a sale of SCM stock, but she had "questioned" Spira concerning some of the transactions. She admitted that she or her son had initiated a number of transactions in the account, including various "Syntex" purchases and sales, and that the salesman had not recommended Syntex stock to her. She also testified that the purchase of 700 shares of Crucible Steel stock, on which she claimed against defendants an unrealized loss as of the time she withdrew the shares from her account, was initiated by her.

In early February, 1964, plaintiff signed a general power of attorney in favor of her son, Barry Fey, which authorized him to trade for her. She stated that she signed the power only to permit her son to make a day trade in Syntex on her account and because the broker's office manager had requested her to do so. However, she did not terminate the power until June 3, 1964, when she wrote a letter to the broker stating, "I wish to rescind any power of attorney that may exist for anyone but myself to trade for my account with you." Plaintiff could not recall why she wrote this letter.

During cross-examination the plaintiff initially denied that she had done any other trading while she was dealing with the defendants. When shown copies of monthly statements of her account with Harris, Upham & Co., which disclosed seventeen trades during the period of her dealings with defendants, she admitted that these were her transactions and could not recollect whether she was dealing with a third broker at the time. She was shown Schedule D of her 1964 federal income tax return which disclosed stock trades in addition to those disclosed by the Walston, and the Harris, Upham monthly statements. She initially denied that prior to dealing with defendants she had bought and sold the same security on the same day but modified her testimony when shown a statement of her account with A. G. Becker & Co.

But even though her contemporaneous investment experience with other brokers was gone into, the court refused to permit inquiry concerning plaintiff's stock trading prior to her dealings with defendants other than for limited impeachment purposes, restricted defendants from laying foundations for such impeachment, and refused to admit into evidence brokerage statements of her other accounts either prior to her dealings with the defendants or concurrent therewith. The trial court also refused to permit defendants to develop evidence concerning plaintiff's investment objectives by questions with reference to allegations in the stricken paragraph 5 of

her complaint to the effect that her investment requirements were maximum security and long term growth.

The general effect of plaintiff's testimony was to represent herself as a customer with some fixed ideas of her own, relying somewhat on her son and occasionally on other brokers, but otherwise generally relying upon the initiation, advice or acquiescence of the defendant Spira in view of the confidence she reposed in him.

The plaintiff's expert witness, Corbett, had been employed by the Securities and Exchange Commission from 1941 until 1969, the last eleven years as Chief of Investigations for the Chicago Regional Office. Before that he had been with Lamson Brothers & Co., a member of the New York Stock Exchange. In preparation for the trial he had reviewed in detail the plaintiff's account confirmations and monthly statements from Walston for the purpose of determining whether the activity in that account was "excessive". His analysis included the determination of "turnover of the net investment" for the 26 month period of the account. Total purchases amounted to $165,559.58, and total sales were $139,327.36. After crediting defendant $19,046.98 for the securities that had been delivered to plaintiff, there was a trading loss of $7,185.24, and an interest expense of $885.04 which amounted to a total of $8,075.88, including a tax item of $5.60. The unrealized loss of $3,655.73, attributable to stocks held in the account at the time it was closed including the Crucible Steel stock heretofore referred to, when added to the realized loss of $8,075.88, indicated a total loss of $11,731.61, including commissions of $3,573.06, according to Corbett's testimony. To determine turnover ratio Corbett took the net average monthly investment and divided it into the total purchases. By this means turnover rate for the 26 month period was determined to be once every 2 months, or 13 times, which in Corbett's opinion was "excessive". The witness on cross-examination conceded that in

order to determine whether there was wrongful excess trading one would have to look into the customer's motives and objectives, which the witness had not done; that before the SEC would proceed with a churning charge it would have to have more information than was shown by the confirmations and monthly statements in evidence, and that legal questions which he had not considered, as well as the factual questions which he had investigated, would enter into any decision whether there was "churning".

Other witnesses were called in support of plaintiff's case, including former and current Walston employees, but they supplied no significantly new or different information.

Spira testified in his own behalf and called his wife and a former secretary as additional witnesses, whose testimony was essentially consistent with his positions but again added little of significance. Spira asserted that he made no trades without orders from Mrs. Fey or from her son while the latter held her power of attorney and that he acted in good faith in endeavoring to carry out plaintiff's desires and in her interest. He was unable to remember the details of many transactions and as to why they were made.

Without intending any comprehensive summary of the extensive and complicated record, we believe sufficient background now has been provided to permit meaningful discussion of the asserted errors of the trial court.

I

■ As confused as some aspects of plaintiff's case may have been, we must hold that substantial credible evidence supported the verdict of the jury in favor of plaintiff, at least on the issue of liability, in view of our duty here to look to that evidence favorable to her and to resolve debatable inferences against the movants. Avern Trust v. Clarke, 415 F.2d 1238 (7th Cir. 1969), cert. denied, 397 U.S. 963, 90 S.Ct. 997, 25 L.Ed.2d 255 (1970); Zuckerman v. Borg Mfg. &

Sales Co., 279 F.2d 904, 905 (7th Cir. 1960); Cleary v. Indiana Beach, Inc., 275 F.2d 543 (7th Cir.), cert. denied, 364 U.S. 825, 81 S.Ct. 62, 5 L.Ed.2d 53 (1960). We reject Spira's contention that a change in appellant's theory of the case rendered the record inadequate. It is to be remembered that allegations of the complaint other than the stricken paragraph 5 encompassed the claim of churning. The defendants had notice of this claim throughout the proceedings despite the confusion raised by the court's rationale in striking paragraph 5. In reality some of the assertions of that paragraph were themselves inconsistent with the theory of churning. The motion for a directed verdict and for judgment n. o. v. were properly denied, since they did not reach vulnerable aspects of the proceedings below to which we now turn.

## II

■ In a churning case the independent objectives of a customer are an important standard against which to measure claimed excessiveness. Booth v. Peavey Company Commodity Services, 430 F.2d 132 (8th Cir. 1970); Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 432, 435 (N.D.Cal.1968), modified in part and aff'd, 430 F.2d 1202 (9th Cir. 1970); Moscarelli v. Stamm, 288 F. Supp. 453 (E.D.N.Y.1968); 80 Harvard Law Review, "Churning by Securities Dealers", 869, 874–75. Certainly evidence bearing upon the experience, sophistication or trading naivete of the customer may be highly significant. *Ibid.* See also Newburger, Loeb & Co., Inc. v. Gross, 365 F.Supp. 1364 (S.D.N.Y.1973). Despite the trial court's early impression that the sole question was one of authority and plaintiff's initial testimony that the trades in question were without her authority, some of her later testimony supported the theory of abuse of authority through churning. The trial court, inconsistent with evidential developments in the case, applied discriminately against the defendants from time to time its initial erroneous

view and precluded full exploration by the defendants of plaintiff's continuing churning theory. It obstructed cross-examination of plaintiff concerning prior stock dealings designed to throw further light upon her trading sophistication. And it unduly limited inquiring as to her investment requirements or objectives on the ground that such examination would have reference to subject matter stricken from plaintiff's complaint.

■ Appellants complain in this connection also that the court refused to permit them to examine plaintiff concerning her son's gambling during 1963–64, and to receive evidence of the son's declaration to Spira that he was hoping to "bail himself out" by trading plaintiff's account. Such statements, so extraneous to the issues on the surface, had acquired relevance and possible significance in explanation of a statement in a memorandum prepared by Spira and introduced into evidence by plaintiff that " . . . considering the mental attitude of the account, I feel we should have something on record for our protection." Spira testified in making an offer of proof out of the presence of the jury that he had in mind the excluded declarations when he wrote the memorandum. Plaintiff, having brought this memorandum into the case for the purpose of raising an inference of consciousness of wrongdoing on Spira's part, could not reasonably object to Spira's explanation of what he was referring to by its cryptic language. Yet the problem is not all that clear. At another point Spira was permitted to refer to plaintiff's comment concerning her son's gambling problem. And to be in a position of justifying especially active trading by ascribing it to a compulsive gambler holding plaintiff's power of attorney seems a two-edged sword and arguably could render the preclusion non-prejudicial, although erroneous. In any event, on retrial, a fuller exploration of the reasons for writing the memorandum will be appropriate should either side elect to pursue them.

■ The trial court indicated that, since plaintiff was available as a witness at the trial and had testified in open court in some detail concerning the subject matter, it was improper for defendants to use portions of her pre-trial deposition except for impeachment purposes. Accordingly objections to the introduction of portions of that deposition as a part of defendants' case were sustained. Rule 26(d) Fed.R.Civ.P. circumscribes the use at trial of the depositions of non-party witnesses, but with reference to parties or their officers, directors or managing agents, depositions "may be used by an adverse party for any purpose". The pre-trial deposition of a party is in a position different from that of an ordinary witness, and may be introduced as a part of the adversary's substantive proof irrespective of the fact that the party is available to testify or has testified at the trial. Community Counselling Service, Inc. v. Reilly, 317 F.2d 239 (4th Cir. 1963). See also Cleary v. Indiana Beach, Inc., 275 F.2d 543 (7th Cir.), cert. denied, 364 U.S. 825, 81 S.Ct. 62, 5 L.Ed.2d 53 (1960), *supra*. Yet there are limitations which afford a trial court reasonable latitude for expedition of the trial. Useless encumbrance of the record cannot be insisted upon in any case. American Fidelity & Casualty Co. v. Greyhound Corp., 258 F.2d 709 (5th Cir. 1958). *Cf.* Ikerd v. Lapworth, 435 F.2d 197, 207 (7th Cir. 1970). Repetitious or immaterial matter may be excluded, and the court may require identification of germane portions by specific offer. Zimmerman v. Safeway Stores, Inc., 133 U. S.App.D.C. 342, 410 F.2d 1041, 1044 (1969).

■■ Only a minor part of the proffered deposition evidence passes muster in view of such qualifications to the general rule. Defendants unsuccessfully sought to introduce plaintiff's deposition testimony concerning statements made to her by third parties on the basis of which she decided to buy 700 shares of Crucible Steel stock through the defendants. Plaintiff attempts to justify the exclusion by pointing out that she testified at the trial that she herself had made the determination to buy the stock. So she had, and to this extent her testimony was consistent. But the deposition testimony also suggested a somewhat speculative reason for the purchase, bearing relevance to one of the important issues in the case—her trading objectives. Walston, at least, is hardly in a position to complain, because its counsel blocked further inquiry on the latter point.[7] Defendants were on solid ground in their offer to prove that plaintiff said in her deposition that she made no complaints about trades to Spira or anyone else upon receiving confirmations from the company. This was inconsistent with her testimony at the trial that there were instances when she did make complaint. Other deposition offers were repetitious of testimony already before the court and were reasonably rejected within the discretion of the trial judge. We do not mean to indicate that adverse parties by deposition admissions are not permitted to cumulate evidence against an opposing party. They may do so as a general rule for the same reason that they may do so through live witnesses, but within the rules of reason mentioned.

■ Defendant Spira contends that plaintiff's witness Corbett did not qualify as an "expert" on the issue of "excessive trading", and in any event, inferentially, that his testimony was incompetent or subject to objection because it involved no explanation or standard by

7. "Q. (By counsel for plaintiff): What was your intention at the time you purchased those shares? [The 700 shares of Crucible Steel stock.]

"Mr. Conger: I'm going to object . . . unless it is shown that this was somehow—

"The Court: As to what her purpose was?

"Mr. Conger: Well, unless it was communicated in some way. I mean, how can that affect the trades?

"The Court: I think we do not need to go into motives now."

which excessiveness was or could be determined. We believe the court's ruling as to qualifications was within its discretion. The effect of Corbett's testimony is another matter, particularly in view of the cross-examination in which he conceded that investment objectives and other circumstances, which he had not considered, would be essential in determining whether any so-called "excessiveness" could constitute unlawful churning. No motion to strike the testimony concerning the witness' concept of excessiveness was interposed following cross-examination. If there were error disclosed in the record it was effectually lighted up only by the exceptions sought to be interposed by defendants to the court's instructions to the jury, which remain to be considered.

### III

At the threshold of the instruction problem we are confronted with an absence of exceptions following the court's charge to the jury. Prior to arguments and the giving of the instructions counsel clearly indicated their position on most of the points now relied upon. The court expressly stated that these "exceptions" would carry over under the Rule. Even though there may have been adherence to the letter of Rule 51, Fed.R. Civ.P., such procedure ran counter to its intent and contravened its purpose. Hetzel v. Jewel Companies, 457 F.2d 527 (7th Cir. 1972). The taking of "exceptions" before rather than after the charge tends to turn Rule 51 upside down. Dunn v. St. Louis-San Francisco Railway Co., 370 F.2d 681 (10th Cir. 1966).

 The *Hetzel* remedy (see also Swift v. Southern Railway Company, 307 F.2d 315 (4th Cir. 1962)) of relieving an appellant from the restriction against asserting exceptions not timely taken would not be appropriate where the fault lies primarily with the party rather than the court. Here both the trial judge and the appellants assumed that the earlier objections to proposed instructions were "preserved under the rule", as the former expressed it. Such mutual assumptions do not necessarily justify departure from the rule and in any event could afford no basis of review if the premature exceptions were only general, or related to matters of form or other problems that could be pinpointed only after a charge was given. See Johnson v. Chesapeake and Ohio Railway Company, 227 F.2d 858 (7th Cir. 1955). And record anticipation of every conceivable objection to a forthcoming charge often serves to encumber the record needlessly on points that become immaterial or are corrected by the charge as actually given. We have considered it proper for future guidance to again emphasize the intent of the Rule as discussed more fully in *Hetzel* and to sound a note of warning concerning waiver of exceptions which was not explicit in the latter case. But we have chosen to review the objections argued here, since all of them were specifically pointed out to the trial court in connection with pre-instruction discussions, or inextricably relate to objections so pointed out and carried over by reference, with the approval of the trial court, into the post-instruction time frame.

Defendants' basic objection to the court's charge is its failure, by refusing to give Walston's requested instruction "O" or its equivalent, to fully define the offense of "churning". This failure lights up what we regard as a pervasive error of the lower court in resisting the exploration or signification of plaintiff's investment objectives in mistaken reliance upon the striking of paragraph 5 of the complaint. The refused instruction in most respects was consistent with the instructions of the court in their totality, but it did appropriately collate and enumerate some of the essential elements of a churning case to include consideration of the known objectives of the plaintiff, and it did acquaint the jury more fairly with defendants' theory of defense.

 Most of the court's instructions on the issue of liability, extracted large-

ly from Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968), modified, 430 F.2d 1202 (9th Cir. 1970), *supra*, were quite proper. Somewhat buried in the charge, however, was reference to the element recognized in *Hecht* that the salesman failed to conform to the customer's objectives (283 F.Supp. at 435). This was an important point, for if a salesman does only what the customer independently has in mind as an objective, has authority so to do, and fulfills any fiduciary duty to furnish fair advice, the additional motive of the salesman to earn commissions does not convert the transactions into a deceptive or manipulative device in violation of Section 10(b).[8] Plaintiff seems to accept these qualifications by her argument that her requested instructions 20 and 22 as given by the court, "properly instructed the jury that the needs and objectives of the plaintiffs (sic) were to be considered in determining whether excessive trading occurred."[9]

"Churning" was not mentioned by the court in the instruction in which the objectives of plaintiff were referred to, although the subject of objectives was more pertinent to the concept of churning than to that of control, which was mentioned. The passing reference to the "needs and objectives of Hetty Fey" in the recitation of a state of circumstances under which the plaintiff was entitled to recover did not in and of itself, nor in connection with the entire charge, tell the jury that this was the only state of facts under which plaintiff could recover. On the contrary, it was

repeatedly indicated that plaintiff could recover if defendants were guilty of "churning";. the court neglected to present affirmatively any meaningful state of facts under which defendants might be entitled to a verdict of no cause of action in accordance with their primary theory of defense.

Mindful of the general and important principle that instructions of the court must be considered as a whole and not by fragments, Allers v. Bohmker, 199 F.2d 790, 792 (7th Cir. 1952), yet we have concluded that the deficiencies pointed out were such as to tend to mislead the jury, especially in view of plaintiff's testimony tending to indicate that she independently controlled at least some major trades, related errors of the court, in the exclusion of evidence bearing upon her trading objectives and prior experience, and the rule that both parties are entitled to have their respective theories of a case fairly presented to the jury. Florists' Nationwide Tel. Del. Net. v. Florists' Tel. Del. Ass'n, 371 F.2d 263 (7th Cir.), cert. denied, 387 U. S. 909, 87 S.Ct. 1686, 1691, 18 L.Ed.2d 627 (1967); Wetherbee v. Elgin, Joliet & Eastern Ry. Co., 191 F.2d 302, 311–312 (7th Cir. 1951); Halladay v. Verschoor, 381 F.2d 100, 113 (8th Cir. 1967).

Defendants contend that the court erred in telling the jury that " . . . [c]ontrol sufficient to warrant protection may be inferred from the evidence that Hetty Fey invariably relied on Robert A. Spira's recommendations, if you find in fact that she did so

---

8. See the late case of Newburger, Loeb & Co., Inc. v. Gross, 365 F.Supp. 1364, 1371 (S.D.N.Y.1973).

9. Plaintiff's No. 20. "If you find, from a preponderance of the evidence, that Hetty Fey so relied upon the recommendation of Robert A. Spira, that he did control the volume and frequency of transactions of Robert A. Spira (sic), abusing the confidence reposed in him, recommended and induced an excessive number of transactions, on which commission and profits were received without regard to the needs and objectives of

Hetty Fey, that is if you find all that to be true, then there was a device, scheme or artifice to defraud within the meaning of the Securities and (sic) Exchange Act."

Plaintiff's No. 22. "The court will now define the word 'churning':

" 'Churning', as that term has been discussed herein, involves bad faith and fraudulent purpose of the broker to derive a profit for himself, or itself, by disregarding the interest of his or its customer, and excessively trading in an account while he or it controls same. . . ."

rely upon Robert Spira's recommendations." If interpreted as an assumption that in making all of her investment decisions she acted only upon recommendations of Spira, this instruction would be clearly erroneous as assuming facts not shown by the record, and in fact contrary to the evidence; if interpreted as meaning that if the jury found that plaintiff followed Spira's recommendations to the extent recommendations were made by him this could be considered on the issue of control, the instruction would have been more in keeping with the evidence, although not completely so. That the word "invariably" could lead to misinterpretation by the jury is confirmed by the transcript of pre-instruction discussion during which the court at first indicated that it would not use the term and later changed its mind in view of the difficulty of finding a substitute expression that satisfied the parties. Any such invitation to the jury to accept facts having no support in the evidence or involving likelihood of misinterpretation in this respect no doubt will be avoided upon retrial.

 Plaintiff relied at least in part upon the alleged abuse by Spira of a fiduciary relationship for her claim of the churning of a controlled account. It is defendants' contention that the mere existence of a broker-customer relationship did not itself give rise to a fiduciary relationship and that the existence of that relationship involved a fact which plaintiff had to establish by "clear and convincing evidence". While the court gave that portion of Walston's requested instruction defining such a relationship, it refused to include a second paragraph which would have told the jury that "where such a relationship is sought to be established by parole evidence the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion." Defendants say that the refused

instruction embodies prevailing Illinois law as illustrated by Lahman v. Gould, 82 Ill.App.2d 220, 226 N.E.2d 443 (1967).[10] The mere existence of a broker-customer relationship is not proof of its fiduciary character, but on a disputed record the issue remains one of fact. See Avern Trust v. Clarke, 415 F.2d 1238 (7th Cir. 1969), cert. denied, 397 U.S. 963, 90 S.Ct. 997, 25 L.Ed.2d 255 (1970), *supra*. *Cf.* Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D. Va.1968). We do not regard the state rule on burden of proof controlling where, as here, the issue was a mere phase of a larger problem dependent upon the application of federal securities law. We hold that the usual preponderance of evidence test governed even though the relationship of the parties, fiduciary or otherwise, pertained to that problem. *Cf.* Stevens v. Abbott, Proctor & Paine, 228 F.Supp. 836 (E.D.Va. 1968), *supra*.

 Appellants assert that the court erred in refusing to instruct the jury on the defenses of waiver and estoppel. These defenses are available under the Securities Exchange Act upon sufficient showing. Landry v. Hemphill, Noyes & Co., 473 F.2d 365 (1st Cir.), cert. denied, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962); *ibid*, 333 F.2d 568 (9th Cir. 1964), including claims for churning, Carr v. Warner, 137 F.Supp. 611 (D.Mass.1955); Nash v. J. Arthur Warner & Co., 137 F.Supp. 615 (D. Mass.1955). Plaintiff admitted at the trial that she received through the mail written confirmations concerning every trade made on her behalf and that thereafter many, if not all, that she had not specifically authorized in advance were discussed with Spira. There was general testimony from Spira that all trades were authorized in advance either by plaintiff personally or by her son while

---

10. "Where such a relationship [fiduciary] does not exist as a matter of law and is sought to be established by parol evidence,

the proof must be clear and convincing, and *so strong as to lead to but one conclusion.*" 82 Ill.App.2d at 231, 226 N.E.2d at 449.

the power of attorney was in force. The affirmative defenses of waiver and estoppel were not pleaded as required by Rule 8(c), Fed.R.Civ.P. However, if proof tending to establish such defenses was received without objection, defendants' answer could be deemed amended to conform to such proof. Rule 15(b), Fed.R.Civ.P.

■■■ There are two reasons to support the view that the trial court did not commit prejudicial error in refusing defendants' requested instruction on the subjects.[11] The requests themselves did not fully or fairly state the applicable law; and any issues of estoppel and waiver were so merged with the issue of control in the special circumstances of this case as to have rendered their separate treatment redundant, if not confusing.

■■■ To create an estoppel some reliant change in position by the one claiming the estoppel is essential, and waiver presupposes knowledge of one's rights and an intent to relinquish them. Royal Air Properties, Inc. v. Smith, 333 F.2d 568 (9th Cir. 1964), *supra*. Mere failure to read statements and confirmations, or to object to actions revealed therein, could not be deemed sufficient as a matter of law to establish waiver or to raise an estoppel in view of plaintiff's theory of fiduciary relationship and related impositions by defendants. Express consent to churning transactions would not necessarily raise these defenses if such consent were induced by the undue influence of a fiduciary. Indeed, it has been said that transactions initi-

ated by the customer themselves may be indicative of churning where the trust and confidence of the customer vest control in the broker. Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968).

■■■ The vice of churning is not to be localized within a particular transaction. It is the aggregation of transactions excessive in number and effect which constitutes the gravamen of the complaint. One consenting to a particular sale may not by that token agree to a proliferation of similar sales, especially if dealing with a fiduciary in whom there is the right to repose confidence. On the other hand, lack of knowledge of various rights may not be supportive of, or even germane to, the claim of one who independently initiates, or freely and fairly approves, a series of transactions which would constitute churning if induced by an agent for fraudulent purpose. In neither of these circumstances would there seem to be any separate significance of estoppel or waiver as such. Of course if a person experienced in trading and not subjected to undue influence, confirms, as consistent with his own desires to speculate, a series of transactions made on his account, even though initiated in whole or in part by a salesman to enhance his commissions, and thus leads the latter to continue the practice by further transactions similarly approved by his principal, a classic case of ratification, waiver or estoppel may be more readily perceivable. *Cf.* Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bocock, 247 F.Supp. 373 (S.D. Tex.1965); see also 2 Bromberg, Securi-

11. "You are instructed that, if adequate opportunity was given to plaintiff to examine the confirmations and monthly statements of her security transactions with defendant, and if plaintiff failed to examine such confirmations and monthly statements, she cannot thereafter complain that she sustained damage by virtue of the nondisclosure of matters stated in the monthly statements or on the confirmations which she failed to examine." (Request No. Q.)

"You are instructed that if plaintiff examined confirmations and monthly statements which disclosed the transactions made in her account, and failed within a reasonable time to object to defendants about the transactions so disclosed to her, she is barred from thereafter complaining that she sustained damages by reason of such transactions." (Request No. R.)

"You are instructed that if plaintiff subsequently expresses to defendants her consent to any transaction in her account which she did not initiate, she is barred from thereafter complaining that she sustained damage by reason of such transaction to the same extent as if she had originally authorized it." (Request No. S.)

ties Law: Fraud, § 8.4(651–654), p. 204.246–204.255 (1971). Even then, however, the problems of fiduciary relationship, independent action, ratification, undue influence, and control may be so commingled as to make their separate treatment more confusing than instructive.

▓▓▓ Under the peculiar circumstances of this case and on the record made below, we believe that proper submission of the issues framed by the complaint and the general denials would have permitted the jury fairly to consider whether any excessive trading was attributable to the defendants by reason of the usurpation or abuse of authority or undue influence arising from a fiduciary relationship, or whether the plaintiff was independently motivated to excessively trade as dictated by her own objectives and desires. As a part of such inquiry the jury of course would be authorized to consider the extent to which the evidence disclosed plaintiff's independent action or directions, her previous and continuing trading experience, her trading objectives, desires and needs, her reaction to statements and confirmations of trades made on her behalf, and all other surrounding facts and circumstances relevant and material to these questions to the extent revealed by the evidence. In this view, as we have indicated, the failure of the court to involve the jury in the intricacies of estoppel and waiver, as such, was not in and of itself prejudicial. This is especially so in view of our holding, later to be discussed, that the court should have instructed the jury that there could be no recovery for losses on trades independently initiated or knowledgeably approved by plaintiff free from any breach of fiduciary duty on the part of the defendants.

Defendant Walston also complains on the ground that the court failed adequately to instruct the jury as to the statutory defense provided by Section 20(a) of the Securities Exchange Act [12] through specific reference to the statute itself. The court did tell the jury that if it found there was "churning" of plaintiff's account by Spira, and Walston did not maintain a reasonably adequate system of internal supervision and control over Spira or did not enforce with any reasonable diligence such system but on the contrary indirectly induced, participated in or approved and accepted the benefits of any excessive trading found, then it could find that Walston did not act in good faith within the meaning of the Securities Exchange Act and was liable for the damages caused by such excessive trading. The court omitted to expressly instruct the jury, as requested by Walston, that the latter was sued "under 20(a) of the Securities Exchange Act of 1934", to read the jury its text concerning defenses available to controlling persons, and to further charge that if as a controlling person Walston did not directly or indirectly induce the unlawful acts and acted in good faith, it would not be liable.

In view of the extension of the general *respondeat superior* doctrine by Section 20(a) of the Securities Exchange Act of 1934 and its counterpart in the Securities Act of 1933, 15 U.S.C. § 77*o*, courts have tended to emphasize the "control" aspects of vicarious liabilities in the securities context. For example, a manager,[13] an officer and stockholder,[14] or a director,[15] has been held to be a person controlling a corporation

---

12. 15 U.S.C. § 78t. "(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

13. Kemmerer v. Weaver, 445 F.2d 76 (7th Cir. 1971).

14. Whittaker v. Wall, 226 F.2d 868 (8th Cir. 1955).

15. See Mader v. Armel, 461 F.2d 1123 (6th Cir.), cert. denied, 409 U.S. 1023, 93 S.Ct. 465, 34 L.Ed.2d 315 (1972).

or other entity and thus liable for its frauds; and the direction of the transmittal of responsibility frequently has been reversed by a holding that a corporation or other entity is a controlling person and subject to liability for conduct of an agent, representative or correspondent, even though the law of agency itself might or might not sustain such liability.[16] This court has resorted to the Securities Acts in the latter connection to reinforce conclusions reached on the more general ground.[17]

█ But Section 20(a), or the "control" doctrine in general, has not preempted or restricted operation of general rules in the securities field.[18] We see nothing so peculiar in the relationship between the broker and its representative on the record here to preclude the application of the common law principle. Walston, in view of the doctrine of *respondeat superior*, obtained a more favorable instruction through even

general reference to the Section 20(a) defense than it was entitled to, and is in no position to complain.[19]

█ Here the evidence reveals that the acts of Spira, legal or illegal, were done within the scope of the business he was employed to carry out. Walston's answer admits Spira "was one of its officers and registered representative" of its Chicago office. The evidence indicates that the defendants shared in the commissions involved. Spira was not engaged in any undertaking or conspiracy of his own, but was involved in the general type of activity which was expected of him—the handling of trading accounts for others on commission. Under such circumstances we hold that the general law rendered the broker liable for any churning conduct by its representative, and foundation for this result need not be sought within the confines of Section 20(a). Securities & Exch. Com'n v. First Securities Co. of Chicago,

16. See *e. g.*, Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970), *supra*; Richardson v. MacArthur, 451 F.2d 35 (10th Cir. 1971); Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa.1966); Hawkins v. Merrill, Lynch, Pierce, Fenner & Beane, 85 F.Supp. 104 (W.D.Ark.1949). Perhaps reliance by the SEC upon the control theory in disciplinary actions against brokers for acts of their salesmen, where "wilfullness" must be shown to justify revocation of licenses, has tended to extend reliance upon Section 20 of the Act in other contexts. See Reynolds & Co., et al., 39 SEC 902 (1960); R. H. Johnson & Co., 36 SEC 467 (1955), aff'd per curiam sub nom, R. H. Johnson & Co. v. SEC, 97 U.S.App.D.C. 364, 231 F.2d 523, cert. denied, 352 U.S. 844, 77 S.Ct. 48, 1 L.Ed.2d 60 (1956); Merrill, Lynch, Pierce, Fenner & Beane, 31 SEC 494 (1950).

17. Securities & Exch. Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir.), cert. denied, McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972). Chief Judge Swygert first treated the question of liability under the general rules of agency and then dealt with Section 10(b) liability by virtue of the federal controlling person rule.

18. See R. H. Johnson & Co. v. Securities & Exchange Com'n, 198 F.2d 690 (2d Cir.), cert. denied, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952); and Norris & Hirshberg

v. Securities & Exchange Com'n, 85 U.S. App.D.C. 268, 177 F.2d 228 (1949), which recognize that the mere existence of remedial provisions in the Securities Acts does not foreclose the application of similar common law remedies, and also that the converse is true: A statutory remedy may be invoked in a given situation even though the proof is insufficient to sustain a corresponding common law remedy. Indeed, the recognized policy of public protection requires the two types of remedy to be complementary, rather than mutually exclusive.

19. As was said in another case where the trial court had based recovery upon a restrictive doctrine akin to the control section of the Acts:

" . . . Since the language of the statute is less restrictive than the court's instruction, the statute encompasses the direction given, and no prejudice to appellant could have resulted. Cf. 3 Loss 1808–11. Furthermore, under common law principles, a principal is liable for the deceit of his agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal. See Oddo v. Interstate Bakeries, Inc., 271 F.2d 417, 423 (8 Cir. 1959)." Myzel v. Fields, 386 F.2d 718, 738 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

463 F.2d 981 (7th Cir.), cert denied, McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972), *supra*; Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968); Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D. Md.1968), aff'd in part, reversed in part, 422 F.2d 1124 (4th Cir. 1970). *Cf.* Sennott v. Rodman & Renshaw, 474 F.2d 32 (7th Cir.), cert. denied, 414 U.S. 926, 94 S.Ct. 224, 38 L.Ed.2d 160 (1973). In the present case there was more than the kind of "apparent" authority held by the Supreme Court to warrant recovery against a principal in a Rule 10b–5 case. Affiliated Ute Citizens v. United States, 406 U.S. 128, 154, 92 S. Ct. 1456, 31 L.Ed.2d 741 (1972).

■ Pursuant to Spira's request the court gave a missing witness instruction but over defendants' objection substituted the phrase "of no aid" for the requested word "adverse".[20] Defendants argue that by such modification prejudicial error was committed. We agree.

There was evidence tending to establish the prerequisites of a missing witness instruction with respect to plaintiff's son, Barry Fey. Mrs. Fey testified in effect that her son was available to her as a witness; yet he was beyond the subpoena power of the defendants.[21]

There were indications that he could have thrown significant light upon the crucial question whether he initiated under the power of attorney from his mother many of the trades of which she complained, or he may have been able to confirm her testimony that the power of attorney was intended and utilized by

him only for a single occasion. Failure to produce her son under the circumstances reasonably would permit an inference that if called his testimony would have been unfavorable to plaintiff's position. Graves v. United States, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893); United States v. Conforti, 200 F.2d 365, 369 (7th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 782, 97 L. Ed. 1356 (1953); Neidhoefer v. Automobile Ins. Co. of Hartford, Conn., 182 F.2d 269, 270–271 (7th Cir. 1950); Wesson v. United States, 172 F.2d 931, 936 (8th Cir. 1949); United States v. Beekman, 155 F.2d 580, 584 (2d Cir. 1946). See also 2 Devitt and Blackmar, Federal Jury Practice and Instructions, ¶ 71.18, pp. 140–41. The trial court seemed to realize that by modifying the usual instruction it was straining.[22] As given, the instruction could have been more prejudicial than failure to give any instruction at all on the subject, since in one of its possible interpretations it could have reassured jurors wondering about plaintiff's failure to call the son that his testimony would have been merely "of no aid" although not necessarily adverse to plaintiff's case in view of the sufficiency of plaintiff's other evidence. Any such interpretation would have been accentuated by another instruction in which the court told the jury that "the law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial. . . ."

20. "If a party to this case has not produced a witness within his or her power to produce, you may infer that the testimony of the witness would be of *no aid* to that party if you believe each of the following elements. . . ."

21. The record indicates that he lived in Colorado, and was thus beyond the 100 mile subpoena power of defendants. Rule 45(e)(1) Fed.R.Civ.P.

22. In earlier discussion of Spira's request on the subject which was in the usual form and having indicated that he would charge ac-

cordingly the jury with slight modification, the court commented: "If I don't, I think I may be in error." After the court made the substitution now complained of by defendants, the following occurred:

Spira's Counsel: "Your Honor, for the record, the substitution of the words 'of no aid' for 'adverse' do not correctly state the law, and the defendant Robert Spira objects to that modification.

"The Court: Objection noted and overruled. . . . That is as much as I can soften it up."

We find no merit in defendants' objection to the court's use in its instructions of the term "expert witness" rather than "accountant", in referring to Corbett and his charts.[23]

## IV

Defendants assert that the court erred in its instructions on the measure of damages, having charged without qualification that market losses as well as lost profits by way of interest were recoverable if a verdict was returned in plaintiff's favor.[24] The jury obviously fixed damages on the basis of the computations of plaintiff's expert witness—rounding off a mere $5.60.[25] It is the defendants' position that if any damages were recoverable the "quasi-contractual" measure utilized in Hecht v. Harris, Upham & Co., *supra*; Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D. Va.1968); and Newkirk v. Hayden, Stone & Co., CCH Fed.Sec.L.Rep. ¶ 91,621 (S.D.Cal.1965), should have been applied and damages thereby limited to commissions. Additional complaint is made that the effect of the charge was to permit the award of losses plaintiff suffered as a result of market action in securities which defendants did not recommend, and in some instances advised against, and which were independently initiated by plaintiff or by her son under power of attorney.

Plaintiff would have the damage instruction sustained on the basic premise that churning is a unified offense to be established and recompensed not on evidence of individual transactions but by the extended course of operations. The court's adoption of "the out-of-pocket theory", she says, was in keeping with the modern enlightened view, citing "Churning by Securities Dealers", 80 Harvard Law Review, 869, 884 (1967), *supra*, and its thesis that the amount of commissions only may bear no relationship to the amount of losses suffered by a customer from churning.

In an uncomplicated churning case, where a general discretionary power is abused merely to generate commissions, or where through breach of fiduciary duty a broker induces a trusting customer to generally overtrade, we think the plaintiff's position may be the sounder one.[26] A broker's zeal to make commissions undeniably may cause damage un-

---

23. The testimony of an expert witness and any charts or summaries prepared by him . . . are received for the purpose of explaining facts disclosed by books, records and other documents which are in evidence in the case. However, such charts are not in and of themselves evidence or proof of any facts. If such charts or summaries do not correctly reflect facts or figures shown by the evidence in the case the jury shall disregard them.

24. ". . . In arriving at the amount of [any] award, you should include amounts lost while her account was with Walston and Co., Inc., and any damages suffered by the plaintiff because of lost profits; that is to say, profits which the plaintiff would have made but for violation by defendants of the Securities Act and Securities Exchange Act.

. . .

"In arriving at the amount of any loss of profits sustained by plaintiff, the jury are entitled to consider interest earnings that plaintiff could have received at a bank or other savings institutions, as well as any other evidence bearing in the case upon the issue."

25. Plaintiff's claim, based on Corbett's testimony, included $15,565.60 actual damages, composed of (a) losses totaling $11,731.61 (the commission charges of $3,573.06, interest of $885.04 paid to finance stock purchases, and market action net loss of approximately $7,273), together with (b) interest on the amount in (a) above at the prevailing rate for bank savings deposits in the sum of $3,834.99. When counsel for plaintiff asked the jury, during closing argument, to award $50,000 damages, the trial court sustained defendants' objections with the following comment:

"Objection sustained . . . Ladies and gentlemen of the jury, the maximum damages, as I see it, as the law is here, is the $15,400—what is it? . . . $15,565. . . . You are not bound by cents, anyhow, but that is the maximum damages, as I believe the law is. I have to sustain the objection."

26. By this we do not mean to indicate that some other measure of damages should not be considered by trial courts in appropriate cases—loss-of-bargain recovery, for example.

related in amount to what he earned as commissions. Hecht v. Harris, Upham & Co., 430 F.2d 1202, *supra,* dissenting opinion, 1212–1213; see also "Churning by Securities Dealers," 80 Harvard Law Review, 869, 884 (1967). The difficulty here, already adverted to in another connection, is that uncontradicted testimony from plaintiff herself indicated that certain transactions which patently were considered in the jury verdict and which furnished the basis of a considerable portion of plaintiff's loss calculations, were independently instigated by the plaintiff. As it is, there can be no assurance that the jury did not determine that as to some of the most sizable transactions entering into the computation of damages the defendant had no part, either by way of initiation, inducement or encouragement.

 It is now elementary that when precise damage measurements are precluded by wrongful acts, the wrongdoer cannot insist upon exact measurements and the precise tracing of causal lines to an impractical extent; fair approximations are in order. But the unified nature of the typical churning offense does not render the element of causation immaterial. Granting that transaction by transaction appraisals in churning cases often will be inconsistent with the unified nature of the offense, or impractical and sometimes unfair, see "Churning of Securities Dealers", *supra,* at p. 884, the facts here are exceptional. Where, as here, there is strong indication that certain substantial damage components arose independent of the acts or conduct of the defendants, they may not be lumped in for the jury's consideration without at least affording some guide by which they can be eliminated from consideration upon a determination that, indeed, the defendants had nothing to do with them. In this respect the court erred.

It is a closer question whether Spira's motion for remittitur of damages should not have been granted at least to the extent of the Crucible Steel stock component if not as to Syntex losses.[27] There is some evidence that while all Syntex purchases were initiated by plaintiff or her son, certain sales of this stock were not. There is also indication in the record that Spira cooperated in the Crucible Steel transaction, the only difference of opinion between him and plaintiff being whether it should have been paid for by the loan as made or at least in part by the sale of plaintiff's other stock. The motion for remittitur, not joined in by Walston, was presented by Spira below as an alternative to a new trial and here would be moot should a new trial be granted.[28] Our remand is to this effect.

Finally, it is the defendants' contentions that certain items of cost were improperly taxed and that the court erred in entering judgment against them for attorneys' fees. Included in the $18,227.04 costs awarded by the court were the sum of $1,700 for plaintiff's expert witness, expenses of an accountant in the amount of $142, and of an illustrator-diagramer for $50, court reporter expenses for attendance at, and

---

See "Churning by Securities Dealers", 80 Harvard Law Review, 869, 884 (1967), *supra.* We think there may be merit to the view that the traditional discretion left to trial courts should be heavily relied upon while the law in this area remains largely uncharted. *Ibid* at p. 885. And it seems unlikely that a rule can be designed to cover all combinations of fact and their complications beyond the generalization that damages should compensate the customer by fair approximation for the losses sustained as a proximate result of unlawful churning.

27. The motion specified the unrealized loss of $2,528.75 on plaintiff's purchase of 700 Crucible Steel shares plus a proportionate share of awarded interest; and a loss of $3,921.43 on a day trade in Syntex with a proportionate share of the awarded interest.

28. In his brief on appeal counsel says: "Spira also requested, as an (inadequate) alternative to a new trial, the remission of excessive elements in the damages. While the adequate remedy for these, and other, errors would be a new trial, Spira respectfully draws attention to the remission request. . . ."

**1056**

transcribing, pre-trial depositions, and attorneys' fees of $15,660, all of these items being questioned by defendants. The trial court made no findings concerning any special justification for these costs.

Neither the accountant nor the illustrator-diagramer appeared as witnesses, although their work-products were utilized by plaintiff at the trial. The pre-trial depositions were not introduced in evidence but represented usual and justifiable preparation. Within the range of items of cost recognized by law, trial courts have broad discretion, especially where factual evaluations are involved. United States v. Kolesar, 313 F.2d 835 (5th Cir. 1963). See also Gordon v. Illinois Bell Telephone Company, 330 F.2d 103 (7th Cir.), cert. denied, 379 U.S. 909, 85 S.Ct. 197, 13 L.Ed.2d 182 (1964). The allowance of these items was not clearly erroneous. See Farmer v. Arabian American Oil Co., 379 U.S. 227, 235, 85 S.Ct. 411, 13 L. Ed.2d 248 (1964); W. F. & John Banes Co. v. International Harvester Co., 145 F.2d 915 (7th Cir. 1944), cert. denied, 324 U.S. 850, 65 S.Ct. 687, 89 L.Ed. 1410 (1945); Federal Savings & Loan Ins. Corporation v. Szarabajka, 330 F. Supp. 1202 (N.D.Ill.1971); Kaiser Industries Corp. v. McLouth Steel Corp., 50 F.R.D. 5 (E.D.Mich.1970); H. C. Baxter & Bro. v. Great Atlantic & Pacific Tea Co., 44 F.R.D. 49 (D.Maine 1968); 6 Moore's Federal Practice ¶ 54.77[4], pp. 1718–25 (1972). The award of an expert witness fee beyond the statutory allowance was unauthorized on the record. Henkel v. Chicago, St. P., M. & O. Ry. Co., 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932); Gerber v. Stoltenberg, 394 F.2d 179 (5th Cir. 1968); Sather v. General Electric Company, 394 F.2d 179 (9th Cir. 1968); United States v. Kolesar, 313 F.2d 835 (5th Cir. 1963), *supra*; Sperry Rand Corporation v. A-T-O, Inc., 58 F.R.D. 132 (E.D.Va.1973); Hill v. Gonzalez, 53 F.R.D. 1 (D.Minn.1971).

29. The two statutory provisions for awarding attorney's fees in securities cases cited in

We have concluded that the award of attorneys' fees cannot be sustained since this case does not present the "overriding considerations of justice" referred to, nor does it fall within the limited exceptions to the contrary general rule reviewed in Walker v. Columbia Broadcasting System, Inc., 443 F.2d 33 (7th Cir. 1971). See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967);[29] Chaney v. Western States Title Insurance Company, 292 F.Supp. 376 (D.Utah 1968); Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968). *Cf.* First National Bank in Sioux Falls v. Dunham, 471 F.2d 712 (8th Cir. 1973); Kahan v. Rosentiel, 424 F.2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970).

The judgment of the district court is reversed and the cause is remanded for a new trial.

*Fleischmann* at 721, n. 17 are not applicable in this case.