John Harold Lahman, Plaintiff-Petitioner-Appellant, v. W. E. Gould, W. E. Gould and Company and Harriett B. Gould, Executor of Will of W. E. Gould, Deceased, Defendants-Respondents-Appellees, and Philip H. Mitchel, Master in Chancery, Respondent-Appellee.

Gen. No. 50,611.

First District, Second Division.

April 18, 1967.

Rehearing denied May 16, 1967.

Raymond Harkrider, of Chicago, for appellant.

Winston, Strawn, Smith and Patterson, of Chicago (Calvin Sawyier, of counsel), for respondents-appellees.

Philip H. Mitchel, Master in Chancery, pro se, of Chicago, respondent-appellee.

MR. JUSTICE BRYANT delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Cook County which dismissed the plaintiff's complaint, awarded the sum of $34,086 to the defendants and assessed the sum of $40,956.70 in master's fees equally between the two parties. Plaintiff raises four issues on this appeal: (1) that the chancellor erred in refusing to allow him to file his amended and supplemental complaint; (2) in denying his petition to suppress the master's report; (3) in issuing a decree which dismissed the plaintiff's amended complaint for want of equity and which entered judgment against the plaintiff in the sum of $34,086 and assessed costs equally between the parties; and (4) in allowing master's fees in the sum of $40,956.70.

The evidence in this case shows that the plaintiff, John Harold Lahman, was engaged in making profits out of speculative business ventures, and that the defendant, the now-deceased W. E. Gould and his company, W. E. Gould and Company were engaged in the making and brokering of loans to high-risk business ventures such as the plaintiff dealt in. Beginning in 1945, Lahman commenced borrowing money at high interest rates (commissions charged by Gould averaged around 20% per loan) from defendant, W. E. Gould and Company. On many of these ventures Lahman was making such profit that the high interest rates were a minor factor.

In February 1949, Lahman and one of his associates, Henry J. Brubaker, accepted a letter of intent to pur-

chase a Navy Small Parts Plant at Rockdale, Illinois, from the War Assets Administrator, at a price of $875,-000. The property consisted of approximately 26 acres, improved with buildings, containing about 700,000 square feet of space, which the plaintiff planned to lease for industrial use. In April 1949, plaintiff and Brubaker formed an Illinois corporation, Interlake Industries Corporation, hereinafter referred to as "Interlake," for the purpose of taking title to and possession of the property. Shortly after the formation of the corporation, Brubaker, because of illness, assigned to Lahman all of his right, title and interest in the letter of intent.

After June 1949, Gould and Company commenced to make substantial loans to Interlake, for which it received notes of Interlake. Interlake also picked up outstanding Lahman notes held by Gould and Company by the substitution of Interlake notes, thus in effect borrowing money on the very asset he was buying.

In 1950, Lahman and Interlake were in serious financial distress due to unfavorable economic conditions and, according to Lahman, a severe winter. Gould and Company held Lahman and Interlake notes and some Lahman "NSF" checks. It became apparent that the only way in which Lahman could salvage anything was to find a purchaser of the stock of Interlake or of all of its assets. Attempts were made to find a buyer. On March 27, 1950, the property was offered to H. A. Karsten for $1,150,000, which offer was not accepted, and in May the stock was offered to Arnold Hartman for $1,000,000, out of which sum Lahman was to pay $100,-000 of notes payable. This offer also was not accepted. On May 29, 1950, Lahman and defendant W. E. Gould entered into a contract on behalf of Gould's company whereby Lahman completely parted with his interest in Interlake for a price of $960,000. The master found that this agreement "was an arms length business deal between two competent businessmen, each seeking to

salvage as much as they could in the face of the prospect of a default on a land purchase contract" which indeed it was.

Subsequent to the sale of the Interlake stock on May 29, 1950, the defendants refused to lend Lahman any more money. They suggested that Lahman organize a corporation, J. H. Lahman, Inc., which he did. The apparent purpose for organizing this corporation was to avoid the effect of the usury law. Lahman had pledged 55.2 shares of Frantz Manufacturing Company stock with the First National Bank of Chicago as security for a loan of $21,000. The Frantz stock had been the basis of Lahman's financial power; the company was a family-owned manufacturing company in which Lahman was not only a substantial stockholder but was also an officer drawing a salary of $40,000 per year. In July 1950, Lahman borrowed $21,000 through J. H. Lahman, Inc. from the defendants to pay off the First National Bank loan. Lahman, Inc. was charged a commission of $5,000 on this transaction by the defendants who took as collateral security the 55.2 shares of Frantz that had been held by the First National Bank. In November of the same year Lahman faced a substantially similar problem involving a loan from the National Bank of Sterling, where he had pledged 55 shares of the Frantz stock as security for a loan of $22,000. Once again the defendants loaned him money and took as security the Frantz stock and charged a commission of $4,400. Lahman, through his company, J. H. Lahman, Inc., continued to borrow money from the defendants, not from any coercion by the defendants, but as a result of Lahman's indebtedness to persons other than the defendants.

Shortly prior to June 26, 1951, Lahman approached Gould for a loan of $15,000 to $20,000 and was turned down by Gould who said he could not loan any more money "because your collateral is used up." On June

225

26, 1951 the parties signed an agreement which recited that Lahman in consideration of the cancellation of the notes totaling $104,000 and the payment to him of $15,000 in cash, sold his 117.2 shares of Frantz stock to Gould. As he did in connection with the sale of the Interlake stock, Lahman claimed that the sale was not an absolute sale, but was merely a new collateral agreement to secure loans already made with Gould and Company. By the very terms of the agreement which Lahman signed on June 26, 1951, however, it is conceded that the transaction was a sale of the Frantz stock, "This stock is definitely and absolutely sold to us as of this day. Should we desire to sell this stock we will first offer it to you."

As we have already noted, plaintiff raises four issues on this appeal, the first of which is that the trial court erred in denying plaintiff Lahman leave to file an amended and supplemental complaint in excess of eighty pages, following the filing of the master's report. In denying the petition the trial court found: (1) The sufficiency of the evidence contained in the master's report, the transcript and supporting documentary matter, is not challenged by any of the parties to these proceedings as not representing all the evidence respectively offered in support of the merits or substantive issues involved; (2) the proffered complaint was not of sufficient substance or relevance to reopen the hearings on the merits or to have the cause to be reheard on the merits; and (3) the filing of the motion by the plaintiff after the master's report had been filed (some nine years after the filing of the original complaint) came too late to allow the filing of the amended and supplemental complaint.

■ ■ It is clearly the law in this state that the granting or denying of an amendment to the pleadings is a matter for the discretion of the trial court whose ruling will not be disturbed on review, absent a clear showing of abuse of that discretion. Deasey v. City of

Chicago, 412 Ill 151, 105 NE2d 727; Old Salem Chautauqua Ass'n v. Illinois Dist. Council of Assembly of God, 13 Ill2d 258, 148 NE2d 777; Hall v. Gerdes, 68 Ill App2d 119, 215 NE2d 8. The test to be applied in determining whether the exercise of discretion with respect to the allowance of an amendment of the pleadings was proper, is whether it furthers the ends of justice. Bowman v. County of Lake, 29 Ill2d 268, 193 NE2d 833.

Plaintiff's rationale in filing the amended and supplemental complaint is that he was distraught and in financial straits and did not have accurate or adequate information, with the result that his original and amended complaints contained some "improvident, inaccurate or inept allegations"; that over a three and one-half year period the defendants stated and represented that this cause should be decided on the basis of the "extended evidence, both oral and documentary" which "was offered before the master"; but that notwithstanding the above, the master devoted thirty pages of his report to an analysis of the pleadings. This procedure the plaintiff claims was extremely inequitable and unfair because an extended analysis of the pleadings was unnecessary and because the incorrect allegations on which the master relied were corrected or superseded by accurate statements in the statements of facts and other documents filed by the plaintiff with the master.

■ It was manifestly not an abuse of discretion for the trial court to have denied plaintiff's petition to file his amended and supplemental complaint. This complaint came very late in the day of an already expensive and lengthy proceeding, during which time plaintiff had already had two opportunities to assert his claims. We see no abuse of discretion in denying him a third attempt. Moreover, on the basis of plaintiff's allegations it would be necessary for this court to find both that an analysis of the pleadings was crucial to the validity of

227

the master's report and that, that analysis was faulty because of the alleged inaccuracies in the original and amended complaint. It is not apparent, either from the plaintiff's brief or from the record or from a reading of the master's report, that the master's analysis of the pleadings included therein, was critical to the sufficiency of that report. As pointed out by the trial court, no attack was made on the sufficiency of the evidence contained in the report. Moreover, if there were inadequacies in the original and amended complaints, there is no showing of what these inadequacies are or in what way the amended and supplemental complaint would cure these defects. In short, we are of the opinion that the amended and supplemental complaint was of little substance or relevance.

Plaintiff next contends that the trial court should have granted his petition to suppress the master's report and for certain other relief.

Plaintiff cites three items in support of his allegation that the master's report is biased in favor of the defendant and should have been suppressed: (1) the master ignored the testimony that the value of the Interlake stock, whose sole asset was the Rockdale property, as of May 29, 1950, was $1,541,920; (2) the master ignored testimony that the value of the 117.2 shares in Frantz was $1,500 per share on June 26, 1951; and (3) the master assumed, without evidence, that the Korean War which began in June 1950, inflated the value of the Rockdale property and consequently post-Korean War values were irrelevant as to the pre-Korean War values.

█ As already noted, Lahman and one of his associates, Henry J. Brubaker, bought the Rockdale property from the War Assets Administration for the sum of $875,000, and took title on behalf of Interlake. When the plaintiff ran into financial difficulties in this venture attempts were made to dispose of the Interlake stock before the eventual sale to Gould. On March 27, 1950,

the stock was offered to H. A. Karsten for $1,150,000 which offer was not accepted. In May 1950, the stock again was offered for sale to Arnold Hartman for $1,000,-000 out of which sum Lahman was to pay $100,000 in notes payable, for a total selling price of $900,000. This offer was also not accepted. There was also testimony by one of defendants' expert witnesses that the value of Interlake's Rockdale property was $885,000 on the date of the sale to Gould. In view of considerable evidence that the Interlake stock was worth not more than $1,000,000, it cannot be said that the failure of the master to cite the considerably larger figure offered by plaintiff's expert witness is indicative of any prejudice on the part of the master.

Plaintiff's allegation in regard to the Frantz stock is likewise lacking in substance. Lahman, himself, testified that the highest price ever paid for Frantz stock was $600 per share. Plaintiff also testified that the stock had a book value of $1,000 per share in 1949, and that it was increasing in value by approximately $100 per year. Gould paid nearly $1,000 per share when he bought the stock in 1951. The master's failure to include the estimate of plaintiff's witness who was also a personal friend and officer in Frantz does not support an inference of prejudice.

█ ° Plaintiff's third claim of prejudice, that the master prejudiced the plaintiff by taking into account the economic effects of the Korean War is similarly lacking in merit. As a matter of law, it is clear that our courts will take judicial notice, and will not require proof, of periods of inflation and deflation. Central Illinois Public Service v. Thompson, 1 Ill2d 468, 115 NE2d 888; People ex rel. Schmulbach v. City of St. Louis, Mo., 408 Ill 491, 97 NE2d 252.

In view of the utter paucity of the evidence on the issue of the prejudice of the master, and, the overall fairness of his report, we hold that the trial court was

229

not in error when it denied the plaintiff's motion to suppress.

Lahman's next contention is that he is entitled to recover the Interlake stock and the shares in Frantz by way of redemption, restitution or constructive trust. The gist of the plaintiff's argument is that, (1) there was no sale, but (2) if there was a sale, he has a right of redemption because of the existence of a fiduciary relationship or because of the existence of an oral understanding, (3) or the sale is void because the sales price was unconscionable.

■ Plaintiff, in effect, is asking this court to substitute our judgment in place of the findings of the master and of the trial court. That is something that this court should not do unless the findings of the master are manifestly against the weight of the evidence. Rose v. Dolejs, 1 Ill2d 280, 116 NE2d 402; Punzak v. Delano, 11 Ill2d 117, 142 NE2d 64; Gallagher v. Girote, 23 Ill2d 170, 177 NE2d 103.

■ The evidence establishes that the transactions of May 29, 1950, and of June 26, 1951, were unconditional sales of Interlake and Frantz stock. In a supplementary letter to the May 29, 1950, agreement, it is stated that:

> "These notes (held by Gould and Company) are considered as part payment on the purchase price of all the outstanding and issued shares both common and preferred of Interlake Industries Corporation as more fully described in a purchase contract dated May 29, 1950."

In the letter embodying the June 26, 1951 agreement it is stated:

> "This stock is definitely and absolutely sold to us as of this day. Should we desire to sell this stock we will first offer it to you."

230

Moreover, there is testimony (later recanted) that Lahman treated the May 29, 1950, and June 26, 1951, transactions as sales for federal income tax purposes. As we noted earlier, attempts to sell the Interlake property had been made before the sale to Gould. Finally, plaintiff's claim that the agreements were modified oral agreements made at the time the written agreements were made is not credible. The only evidence that there was such an agreement is plaintiff's own testimony, which is contradicted by the fact that plaintiff had previously testified under oath on different occasions (Brubaker v. Gould, 34 Ill App2d 421, 180 NE2d 873) that the transactions were outright sales.

We have already considered the value of the Interlake stock and the shares in Frantz. In view of that finding we cannot say that the defendants paid an unfair price for the stock.

 Plaintiff also contends that a confidential relationship existed between him and the defendants, that the defendants violated the confidential relationship for which reason the Interlake and Frantz transactions should be voided. Equity will raise a trust by construction where there is a fiduciary or confidential relationship and a subsequent abuse of the relation and where actual fraud makes it necessary to protect the rights of the defrauded party and promote the interests of society. Kapraun v. Kapraun, 12 Ill2d 348, 146 NE2d 7; Carroll v. Caldwell, 12 Ill2d 487, 147 NE2d 69; Kochorimbus v. Maggos, 323 Ill 510, 154 NE 235. Plaintiff in this case has produced no evidence of any specific acts which would lead this court to believe that a relationship other than debtor and creditor existed. Where such a relation does not exist as a matter of law and is sought to be established by parol evidence, the proof must be clear and convincing, and so strong as to lead to but one conclusion. Mortell v. Beckman, 16 Ill2d

231

209, 157 NE2d 63; Lux v. Lelija, 14 Ill2d 540, 152 NE 2d 853; Lawrence v. Muter, 171 F2d 380. That is not the case in this situation.

Plaintiff's last point on this appeal is that the master's fees should be reduced or disallowed and that the master's report should be suppressed because of irregularities in the making of deposits with the master.

Beginning on June 7, 1961, about six years after this cause of action was referred to the master, a series of four payments of $5,000 each was deposited with the master without the knowledge or order of the court. Defendants contend that the payments were made pursuant to an agreement between the parties whereby the defendants agreed to guarantee the master's fees and to make deposits on demand of the master. The evidence on the existence of this oral agreement is conflicting.

■■■ Whether the alleged agreement actually existed or not, the plaintiff is quite correct in his assertion that the payments to the master violated both chapter 53, section 38, Ill Rev Stats 1963, and Rule 9.3, Rules of the Circuit Court, which are as follows: chapter 53, section 38, supra.

". . . Upon reference of any matter to the master in chancery the court may, in its discretion, at the time of such reference or at any subsequent time, order any party seeking to offer evidence before the master to deposit with the clerk of the court such sum or sums as may be fixed by the court to secure the payment of any part or all of the costs of such reference; . . . ."

Rule 9.3 (a), supra.

"DEPOSITS AND STIPULATIONS. Before the disposition of all objections to his report, the master shall not request or accept from a party or attorney any stipulation as to the amount of the

master's fees. Before the taxation of his fees, the master shall not request or receive any deposit or payment for his services upon the reference except

"(i) upon approval by the court; or

"(ii) for accrued fees for the taking and reporting of testimony at the statutory rate and for taxable stenographer's fees."

Rule 9.3 (d) Ibid., further provides that:

"The court in its *discretion* (emphasis added) may disallow master's fees in whole or in part in respect to any improper proceedings occasioned by the fault of the master."

██ ██ From a reading of the above provisions it is clear that they do not provide for the suppression of the report because of irregularities in the making of payments to the master. The most that could have been done under the circumstances and provisions of the rules of the Circuit Court was the taking away of all fees earned by the master and that was a remedy available to the court in all cases. The remedy of suppression is not given. There was not the slightest evidence of any prejudice to the plaintiff which would warrant the fixing of the fees by anyone other than the court which heard the matter, and no prejudice in the receipt of any deposits in advance of the court's fixing of the fees.

██ The chancellor found:

"1. That the court has jurisdiction of the parties hereto and the subject matter hereof, and that said decree should contain the following findings:

"(a) The said master's report contains a proper and accurate summation of the facts; and, the master's analysis of the facts therein and his application of the law thereto reflects a high degree of

233

competency in conducting the hearings before him as well as a full comprehension of the issues involved.

"(b) The findings of fact, the conclusions of law and the recommendations contained in said master's report represent a fair and reasonable result derived from the hearings before him, as revealed from the transcript of such proceedings.

"(c) Said master's report should be approved by this Court.

"(d) The Certificate of Fees and Charges of the master attached to his report, which was submitted for the consideration of this court, without objection thereto, should be approved and his said fees and charges should be assessed and charged as costs of these proceedings.

"(e) The defendants, as a unit, voluntarily deposited with the master, during the course of the hearings, the sum of $20,000.00 as an assurance for payment to the master their share of his fees and charges and, with the additional consideration that certain equities on the question of dividends were found by the master in favor of the plaintiff, it is reasonable to assess the costs of the proceedings equally against the plaintiff and the defendant W. E. GOULD & COMPANY. It is the opinion of the court that the deposit for master's fees made by the defendants in no way influenced the judgment or opinion of the master, as the master's report, in no respect, indicates a prejudiced determination of the facts, based upon the evidence submitted."

This was a clear expression of opinion by the chancellor who dealt with this case and knew more about it than any other person, and should be controlling in the fixing

of the master's fees. Hereinbefore we found that the report of the master was fair and accurate.

The only remedy provided by the statute is for a reduction or disallowance of the master's fees. It is clear that the making of the payments had no effect on the fairness of the report. While we do not approve of or condone the practice of making deposits with the master without the knowledge or approval of the court, we feel that the exercise of discretion by the chancellor should not be disturbed absent any showing of wrong-doing on the part of the master or the defendants.

 Plaintiff also claims that the trial court erred in approving the $40,956.70 master's fee. The basis of the plaintiff's complaint on this point is that the master's report failed to contain a request for an order taxing fees as required by Rule 9.2 of the Circuit Court. While the plaintiff filed a petition to suppress the master's report he at no time attacked the amount of the fees or the manner of certification, nor did he make any objection to the trial court on this matter. Plaintiff's failure to preserve as an issue the propriety of the master's fees precludes our consideration thereof. Mitchell v. Art Institute of Chicago, 269 Ill 381, 109 NE 1008.

For the above reasons the decree is affirmed.

Decree affirmed.

LYONS, P. J. and BURKE, J., concur.