JOHN A. McKNIGHT *v.* JOHN H. BELLAMY, JR.

5-5189                                   449 S. W. 2d 706

Opinion delivered February 9, 1970

*Chapman & Wiley,* for appellant.

*Darrell Hickman,* for appellee.

J. FRED JONES, Justice. This is an appeal by John A. McKnight from a judgment of the White County Circuit Court in favor of John H. Bellamy, Jr. in a suit brought by Bellamy against McKnight for the return of the purchase price of a mare which McKnight sold and Bellamy purchased at an auction sale.

John A. McKnight, doing business as Meadowland Quarter Horse Ranch, breeds registered quarter horses and sells them at public auction. In advance of the auction, and in preparation therefor, the history and credentials, including blood lines and descriptions of the animals to be sold, are published in catalogue, or booklet form, and the booklets are distributed among prospective purchasers of quarter horses. At an auction sale held on November 27, 1965, one of the McKnight mares to be sold was "Holiday Dandy" and as to her, the booklet stated: "1966 Sells bred to Silver Light 14,-398 by Show Boy." John H. Bellamy, Jr. farms and raises quarter horses. He attended the auction on November 27, 1965, for the purpose of purchasing a brood mare, and relying on the information contained in the booklet, he bid and paid the sum of $575 for the mare, "Holiday Dandy," believing her to be in foal by the registered stallion, "Silver Light."

The record reveals a custom in the horse auction business and one announced and followed by McKnight, that when a mare is sold under the representation that she had been bred, such representation conveys a reason-

able assumption that the mare is pregnant or in foal. If it should develop following the sale, that a mare which has been sold as a bred mare is not actually in foal, then the purchaser has "return privileges." He may return the mare to the seller's ranch for the purpose of being rebred, and in such event, the purchaser is entitled to select any stallion on the seller's ranch to which the mare may be rebred.

Two days after Bellamy purchased and paid for the mare, he learned that she was not in foal and on December 11, 1965, he returned her to McKnight's ranch to be rebred. Bellamy heard nothing further from the McKnight ranch until on March 8, 1966, Bellamy was advised by McKnight's ranch manager that the mare had died on March 3. Bellamy filed suit in the White County Circuit Court for damages in the loss of the mare because of McKnight's negligence and for the return of the purchase price because of breach of warranty. The trial court, sitting as a jury, rendered judgment in favor of Bellamy for $575. On appeal to this court McKnight relies on the following points for reversal:

"The risk of loss shifted to the buyer at the time of the sale.

That there was no evidence that the appellee sustained any damages."

Mr. McKnight contends that the Uniform Commercial Code sustains his position. He cites Ark. Stat. Ann. § 85-2-519 (Add. 1961)[1] as authority for his first point. and § 85-2-714 (2) as authority for his second. We are of the opinion that neither section is an aid to Mr. McKnight's position under the facts of this case. In citing § 85-2-519, Mr. McKnight quotes from § 85-2-510(1). This latter section was obviously intended and it reads as follows:

"Where a tender or delivery of goods so fails to conform to the contract as to give a right of re-

---

[1]Apparently referring to § 85-2-510(1).

jection the risk of their loss remains on the seller until cure or acceptance."

When this section of the Code is applied to the facts in this case, it is in aid of affirmance, rather than reversal, of the judgment of the trial court.

In his complaint, as amended, Bellamy alleged breach of warranty, and also McKnight's negligence, as a cause of the mare's death. There was substantial evidence from which the trial court could have rendered the judgment it did on either count. There is ample evidence that Bellamy purchased the mare for a brood mare and that McKnight's agents represented the mare as being bred to Silver Light and led Bellamy to believe that the mare was in foal. The evidence is also clear that the mare was not in foal when she was purchased by Bellamy and that McKnight's agents and employees knew she was not in foal at the time she was sold to Bellamy under misleading representations.

R. T. Nelson was an employee of McKnight in charge of the mares in pasture. Mr. Albritton was the ranch manager in charge of the entire operation, and Mr. Donald Gray was a trainer for McKnight and assisted in grooming and showing the animals at the auction sales. The only evidence that the mare purchased by Bellamy was ever bred to Silver Light, as represented in the booklets and at the sale, came from the testimony of R. T. Nelson who testified that the mare ran in the pasture with Silver Light and that he witnessed coverage on two occasions during the summer prior to the sale.

"Q. Do you recall the date, approximate date that you last saw Silver Light cover this mare?

A. Well, no, sir; it was in the summer time when he had them running in the pasture there together."

Donald Gray knew more about the entire transaction than anyone else who testified, and he testified as follows:

"A. I told Mr. Albritton approximately three days before the sale that we had found this mare in heat, which would definitely indicate she was not bred or in foal.

Q. Now, what is the practice when you find that one of these mares has not 'taken' or is not in foal, or if you get evidence she was in heat before a sale?

A. The policy, if your catalogue is already printed, which in this case it was, this should have been brought to the attention of the prospective buyers in the ring before the mare was sold.

Q. In other words, when the horse is run through the ring, if you have knowledge to this effect you announce that condition is out?

A. Yes, sir.

Q. Was this done on that particular day?

A. No, sir, not on this mare."

There is no evidence that the mare was ever bred again after she was returned to the McKnight ranch on December 11, 1965, but there is substantial evidence from which the court could have found that it was through the negligence of McKnight's agents and employees that the mare died on March 3 from sheer lack of proper veterinary medical attention. In this connection Mr. Gray testified:

"Q. Do you recall anything after this mare was sold, concerning this particular mare?

A. Well, in a very short time the mare reappeared at the ranch, was said not to be in foal, and was going to be rebred to one of the farm stallions; the mare was placed in a pasture with some of the company mares, and when I say company I mean Mr. McKnight's mares, in the pasture with them; that was, oh, approximately sometime in December; now, through the month of December and into January this mare, she continued to fall off in weight, and the mare's looks just weren't what they should be; I reported this to Mr. Albritton, and about the 15th of February or 1st of March she was brought into the sick pen, mares that had various and sundry ailments, old mares that just weren't doing as well as they should have been.

Q. Was it your responsibility to take care of the horse?

A. Just the mares in the pasture; I was required to see and report to Mr. Albritton every day.

Q. If there was something wrong with the mare you were to call it to their attention?

A. Yes, sir.

Q. Have you had quite a bit of experience in dealing with animals like this?

A. Yes, sir.

Q. When the condition of the horse came to your attention, in your opinion what should have been done?

A. In my opinion the mare should immediately have had a veterinarian's attention.

Q. Did it get a veterinarian's attention?

A. Not immediately.

Q. Did you call the condition of the mare to the attention of Mr. Albritton?

A. Yes, sir.

Q. Do you recall how long it was before the mare got a veterinarian's attention?

A. Approximately two to three weeks.

Q. Do you recall what finally happened to the mare?

A. One morning we found her down; in other words, she was on the ground and unable to rise; then we, with the help of about four men, we got the mare up, put her in the stall, and then the veterinarian was summoned.

Q. And she died?

A. Yes, sir."

Mr. McKnight testified as follows:

"Q. When you learn, Mr. McKnight, before an auction that a breeding has not taken, or that you learn positively one is not in foal, do you ordinarily announce that in the ring, or do you make the change in the advertisement?

A. Certainly if I had known the mare was not in foal I would have said something about it, yes.

Q. Isn't this the custom in the ring when you know it?

A. I wouldn't say it is the custom; yes, a man should do it if he knows it, certainly.

Q. Otherwise the people buy it believing it has been bred to this particular horse?

A. That is correct. . .

\* \* \*

Q. . . . [W]hen the representation was made that the mare had been bred to Silver Light, what does that mean?

A. Bred and supposedly in foal to the Silver Light Horse.

Q. It is not guaranteed?

A. To the extent that they have the return privileges to breed the mare again the next season." 

In viewing the evidence in the light most favorable to the appellee, as we are required to do, there is substantial evidence in the record before us from which the court could have found a flagrant breach of an express warranty bordering on fraud in the sale of the mare in this case. The trial court would have been justified in finding that McKnight's agents represented that the mare was bred with the full knowledge and intent that buyers would assume that the mare was in foal, when as a matter of fact the mare was not in foal and the seller knew she was not in foal when the representation was made but did not reveal this knowledge at the sale. As a matter of fact the only evidence that the mare had been bred at all was the testimony of Nelson as to such pasture occurrence in the summer prior to the sale in November 27, 1965, and in the light of Mr. Gray's testimony as to the breeding cycles of open mares, it would appear incredible that McKnight's ranch manager and agents would have believed the mare in foal at the time of her sale on November 27, 1965.

There is also substantial evidence from which the court could have found that McKnight's delay in calling a veterinarian upon learning the mare was ill, con-

stituted negligence which was a proximate cause of the mare's death. In any event we conclude that there is substantial evidence to support the judgment of the trial court and that the judgment should be affirmed.

Affirmed.