UNITED AIR LINES, INC., Plaintiff-Appellee, *v.* CONDUCTRON CORPORATION *et al.*, Defendants-Appellants.

First District (1st Division)   No. 77-1497

Opinion filed February 26, 1979.

Rothschild, Barry & Myers, of Chicago, and Bryan, Cave, McPheeters & McRoberts, of St. Louis, Missouri (Norman J. Barry, Joseph P. Della Maria, Jr., Thomas C. Walsh, and Michael B. McKinnis, of counsel), for appellants.

Clausen, Miller, Gorman, Caffrey & Witous, P. C., of Chicago (John J. Witous and James T. Ferrini, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

United Air Lines, Inc. (plaintiff), brought an action for breach of

contract against Conductron Corporation, McDonnell Douglas Electronics Company, a subsidiary of McDonnell Douglas Corporation, and McDonnell Douglas Corporation (defendants). In due course Conductron merged into McDonnell Douglas Electronics Company (later dissolved) and became a division of McDonnell Douglas Corporation. The case involves sale by defendants to plaintiff of an aircraft flight simulator. This machine was destroyed by fire while on plaintiff's property. The trial court entered summary judgment in favor of plaintiff for $1,326,573.20. Defendants appeal.

Defendants contend that the trial court erred in entering summary judgment for plaintiff because the risk of loss of the simulator was upon plaintiff at the time of its destruction. In this regard defendants urge that at the very least there were issues of material fact concerning whether the simulator conformed to the agreement and had been accepted by plaintiff. Defendants contend these factors would shift the risk of loss to plaintiff. Defendants also contend that there was a genuine issue of material fact as to the causation of the fire. Defendants assert that plaintiff's action was barred by a four-year statute of limitations and that the trial court abused its discretion in denying defendants leave to file an amended answer pleading the statute as a bar. Finally, defendants contend that they were not amenable to service of process in Illinois and denial by the trial court of their motion to quash service of process violated due process.

Plaintiff contends that at the time the simulator was destroyed the risk of loss was upon defendants. In this regard, plaintiff urges that defendants defaulted under the terms of the contract by failing to deliver a conforming aircraft flight simulator; this default was never cured; the simulator was never accepted by plaintiff because of its deficiencies and plaintiff at all times retained the right of rejection. Plaintiff further contends that defendants waived the issue regarding the statute of limitations by tardy attempt to raise the point; the trial court acted within its discretion in denying leave to defendants to amend and there was no excuse for the tardiness of defendants. Plaintiff finally contends that defendants have submitted to the jurisdiction of the court of Illinois.

Many of the facts which appear from the pleadings, interrogatories, depositions, and affidavits are undisputed. The purchase agreement between plaintiff and defendants, some 65 pages in length, was executed on December 30, 1966. The agreement contains 19 articles and was supplemented by a number of change orders. It required defendants to deliver a Boeing 727 digital flight simulator to plaintiff on January 13, 1968. A flight simulator is a highly sophisticated electro-mechanical device operated by computers. It is designed to simulate the experiences of a pilot in the cockpit of a jet airplane during flight. As flight simulators

are used for training pilots, they must meet the requirements necessary for approval by the Federal Aviation Administration (FAA). The contract so provided. In addition the contract provided that the simulator would conform to plaintiff's specifications.

The original contract provided for inspection and testing of the simulator by plaintiff at defendants' plant prior to its shipment to plaintiff's Flight Training Center in Denver, Colorado. The defendants agreed to correct any deficiency or discrepancy appearing from such inspection. The agreement further provided that when delivery of the simulator was made title would pass to plaintiff but that such delivery would not constitute acceptance of the simulator by plaintiff. Final acceptance by plaintiff was subject to satisfactory completion and also to certification by the FAA.

Defendants failed to complete fabrication of the simulator by the agreed-upon date. This resulted in a request by plaintiff that the simulator be delivered to the plaintiff's training center in Colorado for the testing process which, under the original agreement, could have been completed at defendants' plant. On February 20, 1969, the parties entered into a modification of the contract referred to as Change Order Number 3. This order provided for disassembly of the machine, its delivery to plaintiff by common carrier not later than February 28, 1969, and reassembly by defendants on plaintiff's premises not later than March 15, 1969. From July 1, 1969, to August 1, 1969, the simulator was to be available to plaintiff for demonstration purposes and for correction by defendants of deviations noted by plaintiff in the above-mentioned testing. The document stated that in the event the defendants were unable satisfactorily to correct all deviations prior to November 1, 1969, the plaintiff would have the right to cancel the agreement and receive a refund of all payments made to the defendants as buyer plus liquidated damages. The change order also gave plaintiff the right to use the simulator for personnel training purposes.

While the simulator was still in possession of defendants upon their facilities, plaintiff's personnel noted some 647 deficiencies in its operation. These difficulties were recorded and reported to defendants by means of written reports referred to as "squawk sheets." The simulator was delivered to plaintiff's facility and was reassembled by defendants on March 14, 1969, in accordance with Change Order Number 3. Since the machine had not received FAA approval, it could not be used as an aircraft flight simulator. It was used for training purposes to acquaint and familiarize pilots with instrument location in the cabin of a Boeing 727 aircraft.

On April 18, 1969, the simulator was tested for 10 hours by two of plaintiff's test pilots. About 10 p.m. a fire was discovered in the machine.

The simulator was substantially damaged. The origin of the fire is unknown. After the fire, plaintiff requested that defendants dismantle and ship the simulator back to their plant for repairs at plaintiff's expense. On May 16, 1969, plaintiff notified defendants that they considered there was a breach by defendants of the warranties contained in the purchase agreement. On June 4, 1969, the parties amended the agreement by Change Order Number 4. This document provided that the plaintiff would receive $60,000 as liquidated damages for the late delivery of the simulator to be deducted from the remaining payments due defendants. Plaintiff commenced this action on May 11, 1973, seeking rescission of the contract and damages. On January 28, 1977, plaintiff filed count VII as an amendment to the complaint. This amendment alleged that the risk of loss of the simulator was upon defendants at the time it was destroyed.

Subsequently, plaintiff filed a motion for partial summary judgment on this risk of loss count. Plaintiff later amended this motion by adding a claim for prejudgment interest. Summary judgment in favor of plaintiff was entered by the trial court based on the theory that the simulator had never been accepted by plaintiff and, therefore, the risk of loss remained upon defendants. The order allowed plaintiff $1,043,434.33 as a refund of partial payments made, $60,000 as liquidated damages for delay and prejudgment interest of $223,138.78; a total of $1,326,573.20. No issue is raised on computation of these damages.

This opinion will state additional facts as required. Also, facts regarding which the parties are in conflict will be duly noted. All contentions advanced by defendants will be considered although not in the order as summarized above.

## I.

After service of process in Illinois, McDonnell Douglas Corporation filed a general appearance. Conductron Corporation and McDonnell Douglas Electronics Company filed special and limited appearances. Both moved to quash service of process. Their motion was supported by affidavits and exhibits. Plaintiff filed a memorandum in opposition to the motions to quash. The trial court denied the motions and these defendants filed general appearances. Defendants raise the issue as to whether their activities constituted transaction of business within Illinois as to subject them to the jurisdiction of the Illinois courts. Section 17 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 17) provides in relevant part:

> "§17. Act submitting to jurisdiction—Process. (1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his personal

representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts:

(a) The transaction of any business within this State."

In *Braband v. Beech Aircraft Corp.* (1978), 72 Ill. 2d 548, 382 N.E.2d 252, the supreme court noted that two requisites must be met to enable a state to assert jurisdiction over a foreign corporation. The first requirement is that Federal concepts of due process must be satisfied. "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154, cited in *Braband*, 72 Ill. 2d 548, 553-54.

The second requirement is that the defendant corporation must have had such minimum contacts "with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." (*Shaffer v. Heitner* (1977), 433 U.S. 186, 203-04, 53 L. Ed. 2d 683, 697, 97 S. Ct. 2569, 2580, quoting from *International Shoe*, 326 U.S. 310, 317, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158.) It has been stated that the contacts with the state of the forum must be sufficient "to make it reasonable and just according to our traditional concept of fair play and substantial justice * * *" to permit the State to enforce the claim. *Gray v. American Radiator & Sanitary Corp.* (1961), 22 Ill. 2d 432, 438, 176 N.E.2d 761, quoting from *International Shoe Co.*, 326 U.S. 310, 320, 90 L. Ed. 95, 104, 66 S. Ct. 154.

The courts of Illinois have also consistently held that what is fair and reasonable must be determined on a case-by-case basis. (*Braband*, 72 Ill. 2d 548, 556; *Gray*, 22 Ill. 2d 432, 440; *Citizens Bank & Trust Co. v. Pittman* (1977), 52 Ill. App. 3d 137, 367 N.E.2d 265; *Wiedemann v. Cunard Line Ltd.* (1978), 63 Ill. App. 3d 1023, 380 N.E.2d 932.) It has also been held in Illinois that it is not merely contacts which are considered in determining whether it is fair and reasonable that a defendant be amenable to service of process in Illinois but also the nature of the business transaction, the applicability of Illinois law, the contemplation of the parties, and the availability of witnesses. *Colony Press, Inc. v. Fleeman* (1974), 17 Ill. App. 3d 14, 308 N.E.2d 78.

It has been otherwise stated that while physical presence in itself is not always necessary, the act or transaction which is viewed as "doing business" must have substantial connection with the State. (*Cohan v. Municipal Leasing Systems, Inc.* (N.D. Ill. 1974), 379 F. Supp. 1022; *Cook Associates, Inc. v. Colonial Broach & Machine Co.* (1973), 14 Ill. App. 3d

965, 304 N.E.2d 27.) As these holdings look to the quality of the contact between the act and the forum, a single act may well be sufficient to subject a defendant to the jurisdiction of the Illinois courts. *International Merchandising Associates, Inc. v. Lighting Systems, Inc.* (1978), 64 Ill. App. 3d 346, 380 N.E.2d 1047. In addition it has been held that the enactment of the statute first above cited indicates "a conscious purpose to assert jurisdiction over nonresident defendants to the extent permitted by the due-process clause." *Braband*, 72 Ill. 2d 548, 557, quoting from *Nelson v. Miller* (1957), 11 Ill. 2d 378, 389, 143 N.E.2d 673.

Defendants contend that they did not transact business in Illinois so that the exercise of personal jurisdiction over them violates due process. It is correct that defendants are not registered to do business in Illinois; have no agents or offices here; own no property here and pay no Illinois taxes. The machine here involved was manufactured and partly tested in Missouri, partly tested in Colorado and destroyed there. However, these are all negative facts. The issue is the affirmative or positive contacts between these defendants and the State of Illinois.

The record shows that on December 5 and 6, 1966, Mr. J. Moroney, defendants' assistant manager of contracts, and Mr. W. W. Toole, defendants' program manager, met with plaintiff's representatives at plaintiff's principal offices in Chicago. This meeting occurred approximately one month before the execution of the purchase agreement by the parties. It is conceded that the meeting concerned the aircraft flight simulator and the purchase contract. While there are other contacts between defendants and this State, it is clear that this act alone, most intimately connected with the contract which is the source of this controversy, is sufficient to require defendants to defend this suit in Illinois.

Plaintiff urges additional contacts between defendants and Illinois. The record shows that defendants engaged in employment and hiring activities in Illinois from 1968 through 1969. This activity consisted of campus interviews with students and payment of an employment agency in Chicago for recruiting employees. The record indicates that defendants did business with Illinois suppliers of various products. They conducted a goodly amount of advertising in Illinois for sale of their products including the aircraft flight simulator. However, in addition to these various contacts above described, the meeting in Chicago between representatives of defendants and plaintiff is, in our opinion, the strongest reflection of the contacts between defendants and the State of Illinois.

Precontract negotiations have been held by Federal courts to constitute transaction of business in Illinois. In *Scovill Manufacturing Co. v. Dateline Electric Co.* (7th Cir. 1972), 461 F.2d 897, representatives of Scovill, a Connecticut corporation, and defendant Dateline, an English

corporation, met in Chicago at the 1968 Housewares Show. Subsequent negotiations in Chicago and other cities resulted in a sales contract between the parties. In holding that Dateline, through its meetings with Scovill in Chicago, had transacted business in Illinois within the meaning of the long-arm statute, the court stated (*Scovill,* 461 F.2d 897, 900):

> "A defendant who sends an agent into Illinois to solicit or to negotiate a contract is transacting business within the statutory definition."

To the same effect is *Consolidated Laboratories, Inc. v. Shandon Scientific Co.* (7th Cir. 1967), 384 F.2d 797. In the facts before this court, as in *Scovill,* meetings occurred between representatives of both parties which eventuated in the execution of the purchase agreement.

Other authorities support the conclusion concerning the sufficiency of the single contact between defendants and Illinois. *Morton v. Environmental Land Systems, Ltd.* (1977), 55 Ill. App. 3d 369, 370 N.E.2d 1106, also involved a single meeting for transaction of business. This court held "that a single transaction of business rather than a prolonged series of transactions can be sufficient" as a basis for jurisdiction in connection with litigation which arises as a result of the single meeting between the parties. *Morton,* 55 Ill. App. 3d 369, 372-73.

Similarly, in *Kropp Forge Co. v. Jawitz* (1962), 37 Ill. App. 2d 475, 186 N.E.2d 76, a nonresident defendant from New York was held amenable to process in Illinois as a result of correspondence between the parties and one visit by defendant to plaintiff's factory in Illinois for inspection of the factory and various conversations with plaintiff's employees. This court pointed out, "that the ultimate test is the substance of the act rather than the quantity." (*Kropp Forge,* 37 Ill. App. 2d 475, 481.) The court accordingly concluded that the single act of negotiations between the parties which took place in Illinois constituted sufficient contact with this State to vest jurisdiction in our courts.

We can find no element of unfair treatment in the requirement that defendants proceed with this litigation in Illinois. Defendants do not urge any handicap of a practical nature which could possibly result from their defense of this action in Illinois rather than in any other forum.

Defendants rely heavily upon *First National Bank v. Screen Gems, Inc.* (1976), 40 Ill. App. 3d 427, 352 N.E.2d 285. The plaintiff there was attempting to assert jurisdiction over a necessary and indispensable party. Plaintiff alleged in the complaint that jurisdiction existed as a result of various meetings and conferences conducted in Illinois. No allegation was made as to whether plaintiff or other persons attended the meetings, or what was discussed. This court held that the allegations of fact contained in the complaint were "too sketchy" to allow the exercise of jurisdiction over the defendant. A proposed second amended complaint, with its

exhibits, indicated that the defendant was present in Chicago during one of the meetings in question. However, this second amended complaint was tendered to the court but was never filed. The case was decided on the prior pleadings. In our opinion, the situation there is not comparable to the factual elements which exist in the case before us.

■■ We conclude that the single meeting of December 5 and 6 in Chicago constituted sufficient contact with Illinois to provide a proper basis for requiring defense of this suit in Illinois.

## II.

The next issue involves an amendment to plaintiff's complaint by adding count VII and a subsequent attempt by defendants to amend by adding an additional defense of statute of limitations. This action was commenced by plaintiff on May 11, 1973. The basic theories expressed in the various counts of the plaintiff's original complaint are:

Count I. Breach of the contract by defendants' failure to supply the simulator.

Count II. Breach of express contract warranties by defendants.

Count III. Breach of contract by defendants' failure to correct defects in the simulator noted in writing by plaintiff.

Count IV. *Res ipsa loquitur* theory of negligence by defendants in connection with the fire loss.

Count V. Negligence by defendants in connection with the fire loss.

Count VI. Strict tort liability against defendants.

On June 4, 1974, defendants Conductron and McDonnell Electronics filed their answer to the complaint. On January 6, 1975, McDonnell Douglas Corporation filed its answer to the complaint. No affirmative matter was pleaded in these answers.

On January 28, 1977, with leave of court, plaintiff amended its complaint by adding count VII. This count alleged that there was neither performance of the contract by defendants nor acceptance of the simulator by plaintiff so that the risk of loss of the simulator was upon defendants at the time of the fire. On February 18, 1977, the defendants all joined in an answer to the complaint as thus amended. This answer made no reference to the statute of limitations.

On March 29, 1977, plaintiff filed its motion for partial summary judgment on count VII together with a brief, affidavits and exhibits. By agreement of the parties, various depositions were filed on April 19, 1977. On May 4, 1977, defendants filed a response to plaintiff's motion for summary judgment together with affidavits and exhibits. Plaintiff asserts in its brief in this court that on May 10, 1977, the trial court announced its decision that summary judgment would be entered for plaintiff. Defendants do not challenge this assertion. It appears from recitals

contained in an order entered by the trial court on June 2, 1977, that at the time of this oral ruling on May 10 the court set the matter for further hearing on May 23, 1977, for consideration of the form of the final order.

It also appears from this source that on May 23, 1977, the trial court announced that it would grant plaintiff's motion for summary judgment not only as to liability but also as to damages and directed plaintiff to prepare and present a proper order to that effect. It also appears that at this hearing defendants requested the order not be entered until May 27 because defendants wished an opportunity to file the lengthy specifications of the simulator as stated in the contract. The order recited that on May 27, 1977, the defendants "dropped off at the Court's chambers a proposed amended answer and counterclaim and an order which would allow defendants to file same." The order also recited that the documents in question were "spurious and belated attempts to circumvent this court's ruling of May 23, 1977." The order further recited that the court had already entered the order for summary judgment and that defendants' motion for leave to amend the answer and counterclaim was denied. The final order for summary judgment, also entered June 2, 1977, contains lengthy findings of fact and of law and provides for the entry of judgment in favor of plaintiff and against defendants as above set forth.

In the proposed amended answer, defendants allege that the claim for relief is barred because not timely asserted within four years. (Ill. Rev. Stat. 1977, ch. 26, par. 2—725.) The proposed amended counterclaim sought recovery on the theory that after the fire plaintiff authorized defendants to move the simulator to Missouri. The counterclaim sought damages against plaintiff for $153,112 as the cost of dismantling and checking the machine; storage and insurance costs in the amount of $38,088 and final payment on the purchase order in the amount of $47,105; a total of $238,305.

On June 30, 1977, defendants filed a motion for reconsideration of the summary judgment order or alternatively for reduction of the damages. The motion was supported by an affidavit, lengthy exhibits and a brief. On August 11, 1977, plaintiff filed a response. On that same day, the trial court denied the motion to reconsider and the appeal proceeded. The brief for defendants in this court contains no argument regarding the counterclaim or the amendment thereto or the amount of damages allowed plaintiff. Defendants pray dismissal of count VII of the amended complaint or alternatively submission to a jury of the issues thereby raised; leave to amend their answer to plead the statute of limitations and dismissal of the complaint as to defendants Conductron and McDonnell Douglas Electronics Company for lack of personal jurisdiction.

The Civil Practice Act of Illinois provides (Ill. Rev. Stat. 1977, ch. 110, par. 46):

> "At any time before final judgment amendments may be allowed on just and reasonable terms."

In discussing this section of the statute, this court stated in *Hastings v. Abernathy Taxi Association Inc.* (1973), 16 Ill. App. 3d 671, 674, 306 N.E.2d 498 as follows:

> "Under the provision of the Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110, par. 46(1)), amendments may be allowed enabling the defendant to change his defense or to add a new defense at any time before final judgment. Although the policy of the Illinois courts is one of liberality in the amendment of pleadings (*In re Estate of Gingolph* (1969), 114 Ill. App. 2d 363, 252 N.E.2d 726), parties do not have an absolute and unlimited right to amend. (*O'Neill v. Chicago Transit Authority* (1972), 5 Ill. App. 3d 69, 283 N.E.2d 99; *Ennis v. Illinois State Bank of Quincy* (1969), 111 Ill. App. 2d 71, 248 N.E.2d 534.) Permission to file an amendment rests within the discretion of the trial court and its rulings will not be disturbed on review unless its discretion has been manifestly abused. (*Austin Liquor Mart, Inc. v. Department of Revenue* (1972), 51 Ill. 2d 1, 280 N.E.2d 437; *Furla Studios, Inc. v. Gillen* (1971), 133 Ill. App. 2d 620, 273 N.E.2d 220; *Davidson v. Olivia* (1958), 18 Ill. App. 2d 149, 151 N.E.2d 345.) The test to be applied in determining whether discretion was properly exercised is whether it furthers the ends of justice. *Bowman v. County of Lake* (1963), 29 Ill. 2d 268, 193 N.E.2d 833; *Lahman v. Gould* (1967), 82 Ill. App. 2d 220, 226 N.E.2d 443."

Other authorities illustrative of these same principles are *Erzrumly v. Dominick's Finer Foods, Inc.* (1977), 50 Ill. App. 3d 359, 365 N.E.2d 684; *O'Neill v. Chicago Transit Authority* (1972), 5 Ill. App. 3d 69, 283 N.E.2d 99.

The decision to allow plaintiff to amend its complaint was within the sound discretion of the trial court. This court cannot say that the trial court abused its discretion in allowing plaintiff to do so. The counts of plaintiff's complaint, including count VII, expressed various legal theories upon which plaintiff claimed relief. The factual basis of all of these different theories is virtually identical. Consequently, no unfair advantage was taken of defendants and their defense was not hampered in any manner by the trial court order granting leave to amend by adding count VII. Accordingly, we conclude that the decision of the trial court should not be disturbed on review.

We will next consider whether the trial court properly denied

defendants the right to amend their answer to plead the statute of limitations. Defendants urge this court to consider *Uscian v. Blacconeri* (1975), 35 Ill. App. 3d 80, 84, 340 N.E.2d 618, in which this court stated:

> "Failure to plead an affirmative defense does not constitute waiver, and prior to entry of final judgment, the trial court, in its sound discretion, may permit a party to file an amended answer raising the affirmative matter."

It is correct that the trial court has discretion, as with other amendments, to allow a party to plead an affirmative defense any time prior to final judgment. However, there is no absolute right to amend pleadings and the determination of the timeliness of a request to amend is within the purview of the sound discretion of the trial court. (*Gustafson v. Calumet City* (1968), 101 Ill. App. 2d 8, 241 N.E.2d 512.) But many factors may mitigate against an exercise of that discretionary power.

Defendants' motion to amend their answer so as to plead the four-year statute of limitations for breach of contract contained in the Uniform Commercial Code (Ill. Rev. Stat. 1977, ch. 26, par. 2—725), was made after plaintiff's motion for summary judgment was presented in April of 1977, after the final hearing on that issue on May 23, 1977, and after the trial court had stated that summary judgment would be entered for plaintiff. The timeliness of defendants' May 27, 1977, request for leave to amend must be viewed both in terms of the four-year period which had expired since the suit had begun and the actual decision by the trial court of the motion for summary judgment on its merits. No reason is given for the failure of defendants to plead the affirmative defense at an earlier time.

■■ Also this court is not persuaded that the action is, indeed, barred by the statute of limitations. While it is true that the simulator was destroyed by fire on April 18, 1969, and that this suit was filed on May 11, 1973, the limitation period for breach of contract may not have commenced until November 1969 when the contract as amended was to be fully performed in accordance with Change Order Number 3. We need not, however, decide that issue. It is sufficient for this court to conclude that the refusal to allow defendants to amend their answer was within the sound discretion of the trial court and was consistent with the ends of justice.

### III.

We turn next to the merits of summary judgment in favor of plaintiff based on the theory that defendants should bear the risk of loss for the destruction of the simulator. Summary judgment should be entered "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1977, ch. 110, par. 57(3). See *Century Display Manufacturing Co. v. D. R. Wager Construction Co.* (1978), 71 Ill. 2d 428, 434-35, 376 N.E.2d 993.) In addition it has been held that "the right to summary judgment must be clear beyond question" (*Wright v. Adonis Compania Naviera, S.A.* (1978), 59 Ill. App. 3d 108, 110-11, 376 N.E.2d 4), and that " '[a] reviewing court must reverse an order granting summary judgment if it is determined that a material question of fact does exist.' " *Econo Lease, Inc. v. Noffsinger* (1976), 63 Ill. 2d 390, 393, 349 N.E.2d 1.

To evaluate the risk of loss issue, attention must be given to the impact of both the Uniform Commercial Code and the contract terms. Section 2—510 of the Code (Ill. Rev. Stat. 1977, ch. 26, par. 2—510(1)), provides:

> "(1) Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance."

Few cases involve this section of the Code and those that do merely cite the Code with little explanation. (See *McKnight v. Bellamy* (1970), 248 Ark. 27, 449 S.W.2d 706; *Baumgold Bros., Inc. v. Allan M. Fox Co., East* (D.C. Ohio 1973), 375 F. Supp. 807; *Graybar Electric Co. v. Shook* (1973), 283 N.C. 213, 195 S.E.2d 514; *William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.* (1969), 252 Md. 611, 250 A.2d 886.) The official Uniform Commercial Code Comment provides some guidance by stating that the purpose of this section is to make clear that "the seller by his individual action cannot shift the risk of loss to the buyer unless his action conforms with all the conditions resting on him under the contract." (Ill. Ann. Stat., ch. 26, par. 2—510(1), at 398 (Smith-Hurd 1963).) Of primary importance, then, is the determination of whether or not the simulator so failed to conform to the contract provisions as to vest the right of rejection in plaintiff and whether or not there was acceptance of the simulator by plaintiff.

■■ The purchase agreement provided in part that the simulator would "accurately and faithfully simulate the configuration and performance of * * *" a certain specified Boeing aircraft and that final acceptance of the simulator would be "subject to satisfactory completion of the reliability demonstration requirements * * *" and to Federal Aviation Administration certification. The affidavit of John Darley, an employee of plaintiff who tests and evaluates flight simulators to determine whether they meet plaintiff's and the FAA specifications, states that the simulator at no time met those requirements and that plaintiff was never able to begin acceptance testing. His affidavit states clearly that the machine was destroyed by fire "before that time when United [plaintiff] was to begin acceptance testing * * *." The affidavit of Phil C. Christy, employed by

plaintiff as a technical assistant regarding simulators, reaffirms that as late as February 1969 there were "numerous discrepancies" in the operation of the simulator. These affidavits stand uncontradicted by counteraffidavit. Therefore they "are admitted and must be taken as true." (*Heidelberger v. Jewel Companies, Inc.* (1974), 57 Ill. 2d 87, 92-93, 312 N.E.2d 601.) On February 23, 1977, J. M. Gardner, director of contracts and pricing for defendant McDonnell Douglas Electronics Company wrote a letter to plaintiff's attorney in which he stated that the simulator was "destroyed prior to final acceptance."

Defendants contend that Change Order Number 3, which provided for delivery of the simulator at plaintiff's training center in Denver, resulted in waiver of plaintiff's right to object to predelivery nonconformities. We reject this contention. The change order simply provides that the testing and inspection, which under the original agreement would have occurred at defendants' plant, would take place in Denver. Sections of the original agreement which provide that delivery does not constitute acceptance remain unchanged by this change order Number 3. Also, the language of the change order that testing and inspection would be completed in Denver and that the seller would have access to the simulator to demonstrate compliance are inconsistent with the idea that plaintiff had waived the right to object to nonconformity of the simulator.

Defendants do not contest the fact that there were technical difficulties with the simulator, as evidenced by the hundreds of discrepancy reports, actually 645, prepared by plaintiff's employees during the testing period. Instead, defendants stress the complex nature of the device and urge that plaintiff accepted the simulator despite its manifest deficiencies. In support of this contention defendants look to the six-week period of inspection of the simulator in Denver and cite Uniform Commercial Code section 2—606 (Ill. Rev. Stat. 1977, ch. 26, par. 2—606), which provides:

> "(1) Acceptance of goods occurs when the buyer
>
> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>
> (b) fails to make an effective rejection (subsection (1) of Section 2—602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

Defendants thus wish this court to hold that plaintiff had a reasonable opportunity to inspect the simulator and to reject it prior to its

destruction. This approach completely ignores the terms of the contract. The purpose of the Uniform Commercial Code is set forth in section 1—102 (Ill. Rev. Stat. 1977, ch. 26, par. 1—102), which states that the provisions of the act may be varied by agreement. This court expressed the same principle in *First Bank & Trust Co. v. Post* (1973), 10 Ill. App. 3d 127, 131, 293 N.E.2d 907, where we stated:

> "The Uniform Commercial Code was enacted to provide a general uniformity in commercial transactions conducted in this state and was never intended to be used by courts to create a result that is contrary to the clearly understood intentions of the original parties."

The clear intent of the parties before this court, as stated in the purchase agreement, was that physical delivery of the simulator and payments received by the defendants were not to constitute acceptance of the simulator. Acceptance was to be predicated on successful completion of acceptance testing and also upon receipt of FAA certification. The contract terms definitely anticipated and sanctioned use of the simulator by plaintiff to enable it to determine whether this complex and expensive device met the contract specifications. If use of goods is necessary to allow proper evaluation of them, such use does not constitute acceptance. See *Connor v. Borland-Grannis Co.* (1920), 294 Ill. 58, 128 N.E. 317.

■■■■ This record shows that the simulator at no time conformed to the specifications agreed to in the purchase agreement and it remained nonconforming until its destruction. Although plaintiff had use and possession of the simulator for six weeks that arrangement was expressly sanctioned by the contract to allow testing. Retention of the simulator for testing purposes did not constitute acceptance so as to shift the risk of loss to the plaintiff. The simulator was destroyed before completion of acceptance testing and before receipt of FAA certification. Both were conditions precedent to acceptance of the simulator. In this situation the risk of loss remained on the defendants as seller. On the issue of risk of loss, there is no genuine issue regarding any material fact. On the contrary, in our opinion, plaintiff's right to summary judgment in this regard is clear beyond question. We conclude that the plaintiff is entitled to summary judgment as a matter of law.

Defendants urge that the trial court erred in entering summary judgment for plaintiff because a genuine issue of material fact existed as to the "causation of the fire" that destroyed the simulator. Defendants contend that plaintiff may avoid the contract and recover payments made only if plaintiff can establish that the simulator was destroyed without its fault. By these contentions, defendants appear to take the position that the burden rested upon plaintiff of affirmatively proving absence of its own

negligence as a prerequisite to recovery. We cannot agree. It is true that the simulator was physically located on plaintiff's premises. However, not only was this complicated device initially constructed by defendants but also it was disassembled by defendants' personnel upon their premises, shipped to Colorado and and there reassembled by defendants' employees. Defendants' employees were actually working on the machine prior to and on the very day of the fire. In fact, the record shows that defendants' personnel left plaintiff's premises during late afternoon on that day. In addition, in view of the fact that risk of loss rested squarely upon defendants, as above demonstrated, it would seem to follow logically that if negligence of plaintiff was the proximate cause of the fire that point constituted a matter of affirmative defense to be asserted and proved by defendants.

Defendants cite no authority for the statement in their brief in this court that plaintiff could not recover unless it proved that the simulator was destroyed without its fault. Also defendants' brief recedes somewhat from this theory by making the statement that plaintiff as buyer should not be permitted to *destroy* the goods and still recover the purchase price. That statement is far different from the issue raised by defendants to the effect that there was negligence by plaintiff with reference to the origin of the fire. Furthermore, the authorities cited in this regard by defendants advance no such theory concerning proximate cause of the fire and do not support defendants' contentions. *Ozite Corp. v. F. C. Clothier & Sons Corp.* (1970), 130 Ill. App. 2d 716, 264 N.E.2d 833; *McKnight v. Bellamy* (1970), 248 Ark. 27, 449 S.W.2d 706, and *William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.* (1969), 252 Md. 611, 250 A.2d 886.

Although one of the headings in defendants' brief refers to the cause or origin of the fire, defendants concede that there is no proof of proximate connection between the fire loss and any act or omission by plaintiff. Defendants state that "loss of the simulator may well have been proximately caused by United's [plaintiff's] negligence." However, the discussion immediately following this statement has no relation whatsoever to the proximate cause of the fire. Rather, defendants cite in this regard only matters gleaned from the depositions of plaintiff's employees. Defendants urge that the simulator was left unattended with the power on after a malfunction of the voltmeter was discovered; plaintiff's personnel were negligent in permitting continued operation of an air blower after start of the fire; and many of plaintiff's fire extinguishers were inoperable. Careful examination of these depositions impels us to disagree with these statements. Plaintiff's show that regardless of any defect in the voltmeter, this instrument had no connection whatsoever with the causation of the fire; only one of the fire extinguishers did not operate properly; and the exhaust system was shut

down by an employee of plaintiff as soon as he became aware of the problem.

Basically, however, each and all of these contentions of defendants must be rejected for the reason that no one of them singly nor all of them together have any conceivable relation to the proximate cause or origin of the fire. Defendants concede in their brief that "despite an extensive investigation, the cause of the fire has never been satisfactorily determined." This same position was taken by defendants in response to an interrogatory served by plaintiff. Defendants responded negatively to the question as to whether they had reached any conclusion as to the cause of the fire. They also stated that they had employed no expert to ascertain the cause. As the record shows, the machine was returned to defendants' premises after the fire. Therefore, defendants had the ability to investigate the origin of the blaze. Defendants would appear to be more skilled than any other agency in examining the machine and ascertaining the origin of the blaze.

Plaintiff also urges the failure of defendants to allege in their counterclaim that the fire loss was proximately caused by plaintiff's negligence. Defendants' counterclaim and amended counterclaim alleged simply that plaintiff had "sole and exclusive control" of the facility and that plaintiff's employees "controlled and were present at the facility at the time of the fire * * *." However, these pleadings prayed only for a recovery of damages by defendants with reference to moneys expended in return of the machine to the possession of defendants and insurance, shipping and other costs in connection therewith. These allegations are not strong or even complete allegations of negligence. There is no allegation in these pleadings regarding the proximate cause or reason for the fire. Also, the issue of proximate cause of the fire was never raised by defendants in response to plaintiff's motion for summary judgment. See *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 380-81, 313 N.E.2d 457.

Upon examination of the entire record and all contentions of the parties, we conclude that the summary judgment proceeding raised no genuine issues as to any material fact surrounding the loss of the machine which should properly have been the subject of a trial. We further conclude that the entry of summary judgment was proper in all respects.

For these reasons the judgment order appealed from is affirmed.

Judgment affirmed.

O'CONNOR and CAMPBELL, JJ., concur.